El Pueblo de Puerto Rico, demandante y apelado, *v.* Lope Daniel Lugo, acusado y apelante.

Núm. 13784.—*Sometido:* Mayo 10, 1949. *Resuelto:* Junio 24, 1949.

*Eudaldo Báez García,* abogado del apelante; *Hon. Procurador General Vicente Géigel Polanco, J. Rivera Barreras, Fiscal del Tribunal Supremo y Fernando Fornaris Jr., Fiscal Auxiliar,* abogados de El Pueblo, apelado.

EL JUEZ PRESIDENTE SEÑOR DE JESÚS emitió la opinión del tribunal.

El apelante fué convicto de un delito de violación que se alega fué cometido el día 4 de octubre de 1947. La supuesta perjudicada era para esa fecha una joven mayor de diez y siete años que cursaba el tercer año de Alta Escuela en Sabana Grande, donde residía con su familia, y hacía cuatro meses que conocía al acusado, quien era casado y residía en la misma población.

El día de autos, según declaró ella, salió de su casa alrededor de las ocho de la noche, con el propósito de comprar cierto artículo en una tienda cercana. Incidentalmente se encontró con el acusado, quien a la sazón venía guiando su automóvil. Él se detuvo y la llamó. La invitó a dar un paseo, y al rehusar ella, la cogió violentamente por un brazo y la sentó en el asiento delantero del automóvil. Dió marcha al vehículo y al pasar frente a la casa de ella, para evitar que fuera descubierta por sus familiares, la agarró por el pelo y le bajó la cabeza. Le propuso ir a Cayey, pues para esa fecha él era sargento del Ejército y estaba destinado al puesto militar de aquel pueblo. No aceptó ella y le pidió que la llevara a su casa, pero entonces el acusado le propuso llevarla a la de la hermana de ella, quien residía cerca de Cabo Rojo, siendo aceptada la invitación. Durante el viaje ella no gritó ni rehusó seguir con el acusado. Al llegar a San Germán aquél detuvo el automóvil en un puesto

de gasolina y se desmontó, quedando ella adentro, pero tampoco protestó en forma alguna ni trató de escaparse. De allí partieron para Cabo Rojo por donde pasaron sin resistencia alguna por parte de ella, alegando que no gritó porque estaba llorando. Finalmente, cuando se hallaban a pocos metros de la casa donde residía su hermana, el acusado detuvo el automóvil, le quitó los *panties* y tuvo contacto carnal con ella en el automóvil. En esos momentos ella trataba de pegarle por donde podía y al terminar el acto carnal, el acusado le dijo que se fuera para la casa de su hermana y no dijera nada a nadie porque él volvería. Al llegar a la casa la encontró cerrada. Llamó y su hermana vino a recibirla. No le preguntó qué le había pasado ni ella se lo dijo porque no se atrevía, pues el acusado le había dicho que volvería. Poco después, la hermana empezó a interrogarla, pero nada quiso decirle. Luego se acostaron y más tarde, aquella misma noche, llegaron el padre y el hermano de ella, acompañados del acusado. Volvió la hermana a preguntarle qué le había pasado, pero no se atrevió a decirle. Regresaron juntos a Sabana Grande el padre, el acusado, ella y su hermano. Durante el viaje nada dijo de lo sucedido. Al día siguiente, domingo, el padre no estaba en la casa y ella no se atrevió decírselo a la madre, porque, según declaró, el acusado la había amenazado con matarla si lo delataba. No fué hasta el lunes que le comunicó a la madre lo sucedido y ésta lo informó al padre. Ese mismo día fué examinada por un médico encontrando que había sido recientemente desflorada. Una semana más tarde, el sábado 11, el acusado volvió de Cayey a Sabana Grande. Ella fué a la casa de la madre de él y de allí se trasladaron al Hotel Palma, en Mayagüez, donde permanecieron juntos por espacio de tres días. Allí volvió a tener contacto carnal con él y repreguntada por qué había ido al Hotel Palma y había permanecido allí sin quejarse a nadie, contestó que había ido porque el hermano del acusado la había amenazado con matar al padre de ella

si divulgaba lo sucedido, y que permaneció en su cuarto en el Hotel Palma durante esos días porque el acusado le escondió la peinilla y no quería salir despeinada.

El apelante señala, entre otros errores, el haberse admitido con su oposición, la prueba de corroboración ofrecida por el Fiscal. El Fiscal Auxiliar de este Tribunal solicita, por ese fundamento, la revocación de la sentencia y la concesión de un nuevo juicio.

■ La prueba de corroboración, admitida con la oposición de la defensa, consiste de manifestaciones que, según la madre, el padre y la hermana de la perjudicada, les hiciera ésta algún tiempo después de los hechos. Tales manifestaciones, por lo general, son prueba de referencia, pero por vía de excepción, son admisibles en ciertos delitos, entre ellos, el de violación, para corroborar la declaración de la víctima. Su admisibilidad depende de que se hayan hecho espontáneamente y en la primera oportunidad de hacerlas libre de coacción. A ese efecto dijimos en *Pueblo* v. *Marquez*, 64 D.P.R. 371:

"En ciertos delitos, especialmente en el de violación, a los efectos de conectar al acusado con la comisión del delito, en varias jurisdicciones de los Estados Unidos son admisibles en evidencia las espontáneas manifestaciones que en la primera oportunidad que tuviere la persona perjudicada hiciere a otras personas con respecto a lo que le ha sucedido con el acusado. Esa doctrina prevalece en esta jurisdicción. (Citas.) (Pág. 378).

"*    *    *    *    *    *    *

"En el presente caso, no habiendo hecho la perjudicada las manifestaciones que incriminaban a los acusados espontáneamente en la primera oportunidad que tuvo para ello; tales manifestaciones no caen dentro de la excepción a la regla de la prueba de referencia y por consiguiente no son admisibles en evidencia." (Pág. 382).

Véanse también *Pueblo* v. *Muñoz*, 68 D.P.R. 171 y *Pueblo* v. *González*, 66 D.P.R. 202.

■ A la luz de la doctrina enunciada, examinemos ahora si la evidencia de corroboración presentada por el fiscal era admisible.

La hermana declaró que como a las diez de la noche del 4 de octubre, la supuesta perjudicada llegó a su casa sola y llorando. Ya ella estaba acostada y al abrirle la puerta, su hermana le echó los brazos y le dijo "Ay". Estaba nerviosa. Inmediatamente trató de averiguar lo que le sucedía. Solamente le dijo que tenía miedo. Al preguntarle el motivo que tenía para llegar a su casa a tal hora, le contestó que el acusado la había obligado a montarse en el carro; que le había tapado la cara con el gorro e interrogada si le había hecho algo, ella le replicó que tenía miedo y todo esto lo decía llorando.

La declaración de la madre puede sintetizarse en la siguiente forma: Vió a su hija a su regreso de Cabo Rojo la noche del 4 de octubre. Le preguntó por qué había hecho eso y le contestó que el acusado la había obligado a montarse en el carro para dar un paseo de diez minutos. Ni esa noche, ni al día siguiente, le hizo manifestación alguna sobre lo ocurrido. Fué el lunes que le dijo, sin más detalles, que había sido violada por el acusado. La madre le ordenó que no fuera a la escuela hasta que viniera su padre para informarle lo sucedido. Así lo hizo cuando éste llegó del trabajo y le dijo que llevara su hija donde el médico. Su hija y el acusado no eran novios, no tenían relación alguna ni había tenido novios antes. Más tarde, en el interrogatorio que le hizo, su hija le informó que el acusado la había llevado a casa de su hermana.

Finalmente, la declaración del padre puede resumirse así: Vió al acusado en Sabana Grande el 4 de octubre de 1947, como a las diez y media de la noche, quien le informó que había llevado su hija a Cabo Rojo. El testigo lo requirió para que lo llevara a buscarla, a lo cual accedió. Fueron entonces a buscar al hijo del testigo y juntos los tres, se dirigieron a la casa de su otra hija, donde llegaron como a las once de la noche. Reunidos allí, en una habitación, encontró a la supuesta ofendida llorando. Al preguntarle lo

que le sucedía le respondió que no le podía decir porque tenía miedo. Esa noche no le dijo nada y regresaron a Sabana Grande, el padre, el hijo y la supuesta ofendida juntos con el acusado en el mismo automóvil. El domingo el testigo no estuvo en su casa. A su regreso el lunes, su esposa le dijo que un hombre había abusado de su hija. Ésta le explicó entonces que cuando iba a comprar unas bombitas de goma, el acusado violentamente la cogió por un brazo, la montó en el automóvil, y siguió con ella. Al preguntar a su hija por qué no se lo había dicho antes, le contestó que el motivo era porque tenía miedo por estar presente el acusado.

La declaración de la hermana, primera persona con quien la supuesta perjudicada habló inmediatamente después del acto carnal, era admisible. Según aquella testigo, la perjudicada se limitó a decirle que el acusado la había obligado a montarse en el automóvil en Sabana Grande y le había tapado la cara con el gorro, pero ni siquiera le dijo que él hubiera tenido contacto carnal con ella. La declaración de la hermana, a pesar de estar en conflicto con la de la supuesta perjudicada,(¹) y de consistir de supuestas manifestaciones hechas inmediatamente después del acto, no es suficiente corroboración a los efectos del artículo 250 del Código de Enjuiciamiento Criminal, pues no conecta al acusado con la comisión del delito, ya que en ninguna parte de su testimonio se dice que la supuesta perjudicada le hubiera informado que el acusado tuvo contacto carnal con ella contra su voluntad por medio del uso de fuerza, violencia o intimidación. Bien pudo ella montar en el automóvil contra su voluntad y dos horas después ser persuadida a consentir el acto carnal.

---

(¹)Es significativo que esta declaración fué desmentida por la propia perjudicada, quien, como hemos visto, declaró que su hermana le abrió la puerta, pero no le preguntó qué le había pasado ni ella se lo dijo porque no se atrevía toda vez que el acusado le había dicho que volvería; que más tarde la hermana empezó a hacerle preguntas, pero ella no quiso decirle nada; y que aun después de haber llegado su padre y su hermano, la hermana volvió a preguntarle qué le había pasado, pero ella no se atrevió a decirlo.

■ En cuanto a la declaración de la madre, ya hemos visto que las manifestaciones de su hija no fueron espontáneas ni hechas en la más próxima oportunidad que tuvo ella para hacerlas libre de coacción alguna, pues las hizo dos días después, a pesar de haber dormido el sábado por la noche en su casa y pasar todo el día y la noche del domingo juntas, fuera de la presencia del acusado y sin que entonces existiera motivo alguno que la impidiera relatar lo ocurrido. Tales manifestaciones hechas el lunes no fueron espontáneas ni en la más próxima oportunidad, conforme exige la jurisprudencia. Suponiendo que el sábado, por respeto al padre, la hija no le contara a la madre lo sucedido, era de esperarse que al quedarse sola con ella durante el día y la noche del domingo, lo hubiera hecho. Es de tenerse en cuenta que no se trata en este caso de una niña de tierna edad, sino de una joven mayor de diez y siete años que cursaba el tercer año de Alta Escuela. Es verdad que la perjudicada declaró que el hermano del acusado la amenazó si delataba a éste, pero de su declaración no aparece que esa amenaza, negada por el hermano del acusado, fuera hecha antes de las manifestaciones que hiciera a la madre el lunes.

■ Tampoco era admisible la declaración del padre, pues la comunicación no se le hizo en la primera oportunidad que para ello tuvo la supuesta perjudicada. Tal comunicación le fué hecha el lunes, primero por la madre, luego por la hija. Se dirá que ésta no tuvo ocasión de informar a su padre el domingo lo que le había sucedido pues él no estaba en la casa ese día, pero la madre estuvo todo el tiempo con ella desde el sábado por la noche y ya hemos dicho cuándo se dispuso a hacerle la historia tendente a justificar su conducta con el acusado.

■ Finalmente, de acuerdo con la declaración del médico, la perjudicada había sido desflorada recientemente cuando la examinó el lunes 6 de octubre de 1947. Pero esa declaración no conecta al acusado con la comisión del delito, y por con-

152

siguiente, no es prueba de corroboración. *Pueblo* v. *Feliciano,* 53 D.P.R. 423 y *Pueblo* v. *Baerga,* ante, pág. 90.

█ Convenimos con la defensa y con el Fiscal Auxiliar de este Tribunal en que erró la corte inferior al admitir la prueba de corroboración, y habiéndose perjudicado con ello los derechos sustanciales del acusado, *procede la revocación de la sentencia y la concesión de un nuevo juicio, por si el fiscal tuviera alguna otra prueba de corroboración para sostener la acusación.*