EL PUEBLO DE PUERTO RICO, demandante y apelado, *v.* ARSENIO DÍAZ MARTÍNEZ, acusado y apelante.

*Número:* CR–62–124 *Resuelto:* 11 de marzo de 1963

*José Rafael Gelpí* y *Manuel A. Barreto Barrios,* abogados del apelante; *J. B. Fernández Badillo, Procurador General,* y *Peter Ortiz, Procurador General Auxiliar,* abogados de El Pueblo.

Sala integrada por el Juez Asociado Señor Pérez Pimentel como Presidente de Sala y los Jueces Asociados Señores Rigau y Dávila.

EL JUEZ ASOCIADO SEÑOR PÉREZ PIMENTEL emitió la opinión del Tribunal.

El apelante fue convicto por tribunal de derecho de un delito de violación técnica y sentenciado a cumplir de 10 a 20 años de presidio. Apeló y señala la comisión de ocho errores.

Por el resultado a que llegaremos bastará que consideremos únicamente los errores señalados bajo los números 6 y 7. Los discutiremos en orden invertido.

El error número 7 consiste en que se condenó al acusado sin que hubiese prueba de corroboración.

■ Sabido es que en un juicio por el delito de violación el acusado no podrá ser declarado convicto por la declaración de la mujer agraviada, a menos que su declaración se corrobore con otras pruebas. Art. 250 del Código de Enjuiciamiento Criminal (34 L.P.R.A. sec. 729); *Pueblo* v. *Márquez*, 64 D.P.R. 371.

■ La menor perjudicada en este caso declaró sobre los actos realizados con ella por el acusado. Los hechos expuestos por ella comprenden todos los elementos integrantes del delito de violación. En cuanto a su desfloración, fue corroborada por el médico que la examinó. Esta prueba de corroboración, sin embargo, no conecta al acusado con la comisión del delito, ni sería suficiente para dar cumplimiento al citado Art. 250 del Código de Enjuiciamiento Criminal. *Pueblo* v. *Lugo*, 70 D.P.R. 145; *Pueblo* v. *De Jesús*, 30 D.P.R. 235. Pero la perjudicada declaró además:

"R. Después ella vino y como yo trabajaba en casa de Antonio Ostolaza me fui para la casa de él a cuidar los niños y la señora Celestina Montañez me dijo que me pasaba y yo se lo dije. Ella me vio llorando y me preguntó y yo le dije que mi padrastro [*sic*] me había hecho el daño."

La testigo Celestina Montañez declaró lo siguiente:

"P. ¿Habló con ella ese día?

"R. Si señor.

"P. ¿De que hablaron?

"R. Ese día llegó ella en el mes de septiembre, llegó triste y temblorosa, con un sufrimiento. Yo la note así y le pregunté que te pasa. Me dijo, si usted supiera, [*sic*] con mi papá me pasó una cosa grandísima. Le pregunté y me dice, cuando mi mamá me mandó a Nueva York yo estaba en casa de mi tía. Mi tía me mandó a buscar y un señor trató de hacerme el daño. Yo entonces me fui a casa de otra señora. La señora llamó la policía y no le hicieron gran cosa. Que entonces se vino para Puerto Rico y el señor Arsenio Díaz, el padrasto la había ofendido tres veces, según me contó. Yo le dije, porque no le dices eso a tu mamá. No, porque ese hombre me amenaza a muerte, es un señor peligroso. Yo tampoco me atreví decírselo a nadie por no llevarme mi cantazo, yo le tengo miedo.

"P. Por qué?

"R. Porque es un hombre muy fuerte.

"P. ¿Usted lo conoce?

"R. Si señor si somos vecinos.

"Hon. Juez—

"¿Qué usted quiere decir con que a la niña la había ofendido tres veces?

"R. Yo le pregunté a ella que es eso de ofenderte, yo le pregunté, ¿él te quiso usar como para esposa? y me dijo que si señora. Ella estaba bien temblorosa y llorosa. Yo le dije que qué quería decir con eso, que tuvo relaciones contigo como mujer y marido y me dijo que si. Tuve también miedo porque el es un hombre peligroso.

"P. ¿Por qué dice que es peligroso?

"R. La niña me decía eso que era peligroso y que si se lo decía a la mamá o a alguien la mataba." (Págs. 9 y 10 Alegato Procurador.)

■ Esa prueba, de ser creída, sería suficiente para establecer la corroboración exigida por la ley. *Pueblo* v. *Lugo*, supra; *Pueblo* v. *Muñoz*, 68 D.P.R. 171; *Pueblo* v. *Fuentes*, 63 D.P.R. 44; *Pueblo* v. *Parques*, 34 D.P.R. 566; *Pueblo* v. *Montero*, 34 D.P.R. 284.

Convenimos, sin embargo, con el apelante en que el error número 6 fue cometido. No es difícil concluir, después de un estudio detenido del récord, que el apelante no tuvo la debida asistencia legal. Veamos todo lo ocurrido en este proceso desde su comienzo.

En el acto de la lectura de la acusación el Tribunal le nombró un abogado de oficio al acusado por ser éste insolvente. Dicho abogado hizo alegación de inocente y solicitó juicio por jurado. Inmediatamente la vista del caso fue señalada para el día 19 de febrero de 1962. En dicho día se abrió la sesión del Tribunal presidida por el Juez Villares Rodríguez. Se llamó el caso y acto seguido el juez manifestó que el abogado de oficio del acusado había solicitado permiso para llegar tarde y que a los efectos de tomarle una deposición al Dr. Gerónimo Delgado (testigo de cargo) iba a nombrar al Lcdo. Peña Clos para que representara al acu-

sado ya que el abogado de oficio había manifestado que estaba conforme en que se tomara dicha deposición para despachar al doctor.(¹) Se tomó juramento al doctor y fue examinado por el fiscal y luego contrainterrogado por el Lcdo. Peña Clos. El médico depuso sobre el examen que practicó en las partes genitales de la menor agraviada y sobre el resultado del mismo. Su declaración, al conectarse al acusado con la comisión del delito, era adversa y perjudicial a éste. El acusado afirma ante nos que no estuvo presente durante la toma de la deposición al doctor. El procurador no afirma lo contrario, limitándose a sostener que el derecho del acusado a estar presente durante el juicio en un proceso por delito *felony* no se extiende a la toma de una deposición. El récord guarda silencio en cuanto a si el Lcdo. Peña Clos conferenció o no con el acusado antes de intervenir como su abogado en la toma de la deposición. La impresión que da el récord es que desde que se abrió la sesión del tribunal y hasta que se terminó la toma de la deposición el acusado ni se entrevistó, ni conferenció con el Lcdo. Peña Clos.(²)

Terminada la deposición se decretó un breve receso luego del cual continuó la sesión del Tribunal, esta vez presidida por el Juez Ydrach y el acusado representado por el abogado de oficio original. Se llamó el caso de nuevo y entonces ocurrió lo siguiente:

"Hon. Juez Ydrach—
"¿Preparados?
"Sr. Fiscal—
"Preparados.

---

(¹) Suponemos que el abogado de oficio se comunicó en alguna forma con el Juez Villares para solicitar permiso para llegar tarde al tribunal. No sabemos si fue dicho abogado quien sugirió la toma de deposición al doctor o si fue esa una condición que se impuso para concedérsele el permiso solicitado.

(²) El Lcdo. Peña Clos se limitó a cumplir con la·misión que le impuso el Tribunal y repreguntó al doctor en la forma que él creía poder proteger mejor los intereses del acusado.

"Hon. Juez—

"¿Por el Tribunal de Derecho?

"Lic. (abogado de oficio)

"Sí señor.

"P. ¿Se renuncia al jurado?

"R. Si señor.

"P. Se acepta la renuncia hecha por el acusado."

 Aparentemente hubo una renuncia al juicio por jurado a insinuación del magistrado que en esta ocasión presidía el tribunal. Cuando el acusado solicita ser juzgado por un jurado, amparándose en el derecho constitucional que tiene a ello, la renuncia de ese derecho debe surgir de la decisión espontánea o voluntaria del acusado. Posiblemente cuando la cuestión de esa renuncia emana de una sugestión del juez que preside, coloca al abogado defensor en el delicado dilema de manifestar una preferencia del jurado sobre el juez para que juzgue los hechos. Es deber del abogado, sin embargo, proteger los derechos del acusado sin tener en cuenta otras consideraciones que no sean la mejor defensa de los intereses de su cliente.

Se procedió entonces a dar lectura a la acusación fiscal y el acusado hizo alegación de inocente. Entonces ocurrió lo siguiente:

"Hon. Juez—

"¿Esta declaración jurada del doctor Gerónimo Corrada que está en autos se presentó cuándo?

"Sr. Fiscal—

"Hoy.

"P. Estaba presente el compañero... [aquí el nombre del abogado de oficio del acusado]

"R. El Licenciado Peña.

"P. ¿Ud. acepta esta declaración jurada como prestada por el médico?

"R. Sí.

"P. La acepta que forme parte del caso?

"R. Si señor.

"P. ¿No hay planteamiento que hacer?

"R. No.

"P. Se tiene por renunciado si hubiese alguna?

"R. Sí.

"P. Téngase por Exhibit Uno de El Pueblo. Adelante."

Con esa aceptación y renuncia absoluta por parte del acusado a cualquier planteamiento, se incorporó al caso como prueba inmaculada la deposición tomada al médico, testigo de cargo, por el único motivo de que había que despachar temprano a dicho profesional.

Luego de ese incidente prestó declaración la presunta perjudicada. Declaró con bastante amplitud sobre los hechos e indisputablemente estos incriminaban seriamente al acusado.

A esta testigo el abogado del acusado le hizo dos preguntas. La primera fue que si el acusado era marido de su mamá, y la segunda que si había botado sangre.

La próxima testigo declaró que vió a la perjudicada el día de los hechos fregando y que como la vió llorando le preguntó que si le dolía una muela que se había extraído, contestando ella que no y haciéndole una seña; que a esa misma hora vió por allí al acusado.

El contrainterrogatorio de esta testigo se limitó a una pregunta, a saber, que si la seña que la perjudicada le hacía "era por aquí, por los senos", contestando la testigo en la afirmativa.

En cuanto a la testigo Celestina Montañez, quien declaró sobre la queja de la perjudicada el abogado defensor contrainterrogó con bastante amplitud y solicitó sin éxito la eliminación de su declaración por no ser parte del *res gestae*. También planteó la cuestión, sin mérito alguno desde luego, de que de la declaración del doctor Corrada no se desprendía que la niña hubiera sido desflorada. El fiscal renunció a dos testigos por ser prueba acumulativa y los puso a disposición de la defensa. Del récord surge que el abogado del acusado no hizo gestión alguna para determi-

nar la posibilidad de usar esos testigos como prueba de defensa.

El abogado defensor sentó al acusado en la silla testifical. Negó que hubiera realizado actos carnales con la acusada aunque aceptó que la "grajeaba" y la "manuseaba".

Al terminar su testimonio, ocurrió lo siguiente:

"Hon. Juez — Puede retirarse.

"La señora—

"Mire señora a este señor que es su esposo lo acusan de haber violado a su hija. El Fiscal tiene prueba para demostrarlo que si, él dice que no ha hecho eso. El ha dicho aquí que él grajeaba a su hija, que la manoseaba. . . .

"Defensa — Vamos a preguntarle en relación con la carta.

"Hon. Juez — Juramento (Le toman juramento.)"

Inmediatamente el abogado defensor comenzó a interrogar a la testigo, esposa del acusado. Su testimonio fue sumamente perjudicial a éste.(³) Dicha testigo demostró una

---

(³) Dicha testigo declaró:

"DEFENSA—

"¿Su nombre?

"R. Rosa Julia Rosa.

"P. ¿Dónde vive?

"R. En San Lorenzo, en la barriada Santa Clara.

"P. Usted conoce al acusado?

"R. Si.

"P. ¿Cómo se llama?

"R. Arsenio Díaz.

"P. ¿Ustedes son casados?

"R. Si.

"P. ¿Le escribió alguna carta él desde la Cárcel de Distrito de Humacao?

"R. Si.

"P. ¿En qué términos era la carta?

"R. El me decía que más tarde sería más triste. Ustedes lo ven ahi que parece un santito.

"P. ¿Estas son las cartas?

"R. Ahí están.

"P. ¿Y las otras?

"R. En casa.

"P. ¿La única que interesaba era esta?

"R. ¿Esa nada más? No. Yo quiero decir también que me quiero divorciar.

gran hostilidad contra su esposo, el acusado. Entre otras cosas dijo que el acusado la había amenazado si no lo defendía, que él no era ningún santito y que quería divorciarse de él.

El abogado defensor pudo proteger al acusado oponiéndose a que el Juez interrogara a su esposa *motu proprio*, sin que ninguna de las partes la llamara como testigo. Tampoco debió sentarla a declarar si no conocía cuál iba a ser el tenor de su testimonio. Se trataba de una testigo impedida de declarar contra el acusado, a menos que éste prestara su consentimiento para ello. Art. 402 Ley de Evidencia (32 L.P.R.A. sec. 1734). El testimonio de esta testigo indudablemente contribuyó a fortalecer el caso del Estado.

■ Ratificamos lo que expresamos en *Pueblo* v. *Torres*, 81 D.P.R. 678, al efecto de que las equivocaciones o errores del abogado de la defensa (ya sea éste un defensor público, un abogado de oficio o un abogado que ha sido escogido y remunerado por el propio acusado) no pueden ser de ordinario, invocadas en apelación para obtener una revocación del fallo o sentencia; pero las circunstancias excepcionales que concurren en el presente caso nos llevan al convencimiento de que el acusado no tuvo la debida asistencia de abogado. *Ello conlleva la revocación de la sentencia y que se ordene la celebración de un nuevo juicio.*

---

"P. En ninguna parte de esta carta dice nada de eso; en ninguna habla de amenazas.

"Hon. Juez—

"Lo dice.

"Defensa—

"¿Eso es amenaza que le dice que más tarde será más triste? Nada más señor Juez.

"Sr. Fiscal—

"¿Usted dice que la ha amenazado este hombre?

"R. Si.

"P. ¿Qué le dice?

"R. Me hace asi con la mano. Alli mismo en la cárcel me dijo, 'cuanto [*sic*] de hija de la gran puta como tú no me defiendas a mí'.

"P. ¿Eso se lo dijo en la cárcel?

"R. Si señor." (T.E. págs. 30 a 32.)