# 2001 DTA 157

**TRIBUNAL DE CIRCUITO DE APELACIONES**
**CIRCUITO REGIONAL I DE SAN JUAN**

EL PUEBLO DE PUERTO RICO
Apelado

v.

CARLOS PLACER ROMAN
Acusado-Apelante

Núm. KLAN-00-00039

San Juan, Puerto Rico, a 30 de abril de 2001

Panel integrado por su Presidenta, la Jueza Fiol Matta,
la Jueza Rodríguez de Oronoz y el Juez González Román

Rodríguez de Oronoz, Jueza Ponente

## TEXTO COMPLETO DE LA SENTENCIA

El Dr. Carlos Placer Román fue declarado culpable del delito de actos lascivos e impúdicos el 29 de diciembre de 1999. Inconforme, cuestiona en apelación la apreciación de la prueba y la negativa del tribunal de instancia a concederle un nuevo juicio.

En específico, señala la comisión de los siguientes errores:

*"PRIMER ERROR: ERRO EL HONORABLE TRIBUNAL DE PRIMERA INSTANCIA AL ENCONTRAR CULPABLE AL AQUI APELANTE SIN QUE SE PROBARA SU CULPABILIDAD MAS ALLA DE DUDA RAZONABLE.*

*SEGUNDO ERROR: ERRO EL HONORABLE TRIBUNAL DE PRIMERA INSTANCIA AL DECLARAR NO HA LUGAR UNA MOCION DE RECONSIDERACION AL FALLO DE CULPABILIDAD POR EL DELITO DE ACTOS LASCIVOS E IMPUDICOS, ARTICULO 105(d) DEL CODIGO PENAL DE PUERTO RICO RADICADA POR EL APELANTE POR AUSENCIA TOTAL DE PRUEBA SOBRE LOS ELEMENTOS CONSTITUTIVOS DEL DELITO IMPUTADO.*

*TERCER ERROR: ERRO EL HONORABLE TRIBUNAL DE PRIMERA INSTANCIA AL DECLARAR NO HA LUGAR UNA MOCION DE NUEVO JUICIO RADICADA POR EL APELANTE Y FUNDAMENTADA EN LA REGLA 188 (f) DE LAS DE PROCEDIMIENTO CRIMINAL DE PUERTO RICO."*

A los fines de examinar estos señalamientos de error, expondremos las incidencias procesales y los hechos que emergen de la prueba de cargo.

## I

El Ministerio Fiscal presentó acusación por el delito de actos lascivos e impúdicos, según contemplado en el Artículo 105, inciso (d) del Código Penal de Puerto Rico:

*"Toda persona que sin intentar consumar acceso carnal cometiere cualquier acto impúdico o lascivo con otra, será sancionada con pena de reclusión según más adelante se dispone si concurrieran cualesquiera de las siguientes modalidades:*

*(a) ...*

*(b) ...*

*(c) ...*

*(d) si la víctima fuere compelida al acto mediante el empleo de medios engañosos que anulen o disminuyan sustancialmente, sin su conocimiento, su capacidad de resistencia.*

*(e) ...*

*... ".*

La acusación imputó lo siguiente:

*"El referido acusado CARLOS E. PLACER ROMAN, allá en o para el 1 de junio de 1998, en Río Piedras, Puerto Rico, que forma parte de la jurisdicción del Tribunal de Primera Instancia, Sala de San Juan, ilegal, voluntaria, maliciosa, a sabiendas, criminalmente, sin intentar consumar acceso carnal y compeliendo a la perjudicada al acto mediante el empleo de medios engañosos, sin su conocimiento, que anularon y disminuyeron*

*su capacidad de resistencia al acto y su consentimiento, cometió el delito de ACTOS LASCIVOS E IMPUDICOS con el ser humano MILDRED RODRIGUEZ ARCE, de 27 años de edad, consistente en que mientras la paciente estaba acostado [sic] en una camilla en sus [sic) oficina, le agarró con una de sus manos un seno mientras deslizaba la otra mano por la parte baja del abdomen hasta tocarle la vulva por debajo de la ropa, mientras le preguntaba si la podía chupar, lesionando el pudor de la víctima".*

La prueba relativa a los hechos provino de la perjudicada. Su testimonio fue el siguiente.

La señora Mildred Rodríguez Arce visitó las oficinas del Dr. Placer porque estaba teniendo mucho dolor en el cuello, hombros, pecho y espalda. Fue por primera vez al consultorio del doctor el 22 de mayo de 1998. Esperó sentada dentro del cubículo 3. Le dijo al doctor que le dolía el cuello, los hombros y parte alta de la espalda. A sus preguntas, le indicó que tenía presiones en el trabajo, pero que no eran por hostigamiento sexual. Ese día, el doctor la examinó sentada en la camilla. Le tocó los hombros, cuello, parte de arriba de la espalda, parte del frente del cuello antes de llegar a los senos. El doctor le dijo que tenía espasmos. Le recetó medicamentos y le ordenó unos laboratorios. Le indicó además que la próxima vez llevara una blusa más suelta para él poder examinarla. Le dijo que la quería ver en cinco (5) días. Decidió regresar a la oficina del doctor el 26 de mayo de 1998. Llegó ese día 26 de mayo al consultorio a las 5:15 p.m. En esa ocasión, el doctor la atendió en el cubículo número dos. Ambos cubículos dos y tres tenían una camilla, el escritorio del doctor, la silla del doctor y una silla al lado para el paciente. Esperó sentada y luego entró el doctor, cerró la puerta y le preguntó cómo se sentía. Ella indicó que se sentía un poquito mejor. El doctor le pidió que se sentara en la camilla y le dijo que todos los laboratorios habían salido bien, por lo que los espasmos eran por la presión que tenía en el trabajo. El doctor volvió a examinarle el cuello, mientras ella estaba sentada en la camilla de frente a él. Le indicó que se bajara los manguillos de la blusa y el sostén. Le palpó el cuello, la parte de arriba del pecho sin llegar a los senos mientras le preguntaba si le dolía. También le palpó la parte arriba de la espalda, los hombros. Volvió y se sentó en la silla y el doctor le indicó que le daría un medicamento más fuerte. Luego del examen, volvió a hacerle preguntas tales como si era casada, si tenía hijos, si estaba embarazada, si estaba menstruando. Le hizo una receta con los medicamentos y le dijo que quería verla en cinco (5) días. Volvió al consultorio médico el 1 de junio de 1998, llegando a la oficina médica de 5:20 a 5:30 de la tarde. Fue atendida como a las 6:30 de la tarde. En esa ocasión, la atendieron en el cubículo 3. Pasó y se sentó en la silla. El doctor entró, cerró la puerta y le preguntó cómo se sentía. Ella se sentó en la camilla y el doctor empezó a examinarla por el cuello, los hombros y parte de arriba de la espalda. Este le indicó que se subiera la blusa. Ella se subió la blusa hasta las axilas y el doctor le dijo que se soltara el sostén. En ese momento, el doctor estaba al lado de ella de pie frente a la camilla. Volvió por segunda vez y le palpó el cuello, los hombros, la parte alta de la espalda y la parte frontal del cuello. También le tocó alrededor de los senos y le preguntó si le supuraban y si le dolían. El doctor entonces le pidió que se acostara boca abajo, con la cabeza hacia la puerta. Entonces, frente a la camilla, comenzó a examinarle la espalda desde la parte alta hacia abajo. Cuando llegó a la parte cercana al pantalón, le preguntó si le dolía y ella le dijo que un poquito. Ahí el doctor le dijo que se soltara el pantalón para examinarla mejor. Ella se aflojó el botón y se bajó el zíper del pantalón. El la examinó y la tocó hasta un poquito más abajo. Le dijo que se virara boca arriba. Entonces empezó a examinarla nuevamente desde el cuello, la barriga y cerca de los ovarios. De momento, el doctor introdujo su mano derecha dentro del pantalón hacia su parte vaginal y la tocó hasta adentro. Sintió su dedo dentro de la vagina. Con la mano izquierda, le agarró el seno y mientras tenía fijada su mirada en los mismos le preguntó si se los podía chupar. Ella le indicó que no, mientras intentaba levantarse de la camilla. El la presionó contra la camilla y ella volvió e hizo fuerza y se logró levantar. El doctor entonces salió del cubículo mientras ella trataba de vestirse rápidamente. Estaba asustada y avergonzada. No gritó porque tenía tanto miedo y tanta vergüenza que no sabía que hacer, lo único que quería era vestirse e irse de allí. El doctor volvió a entrar y se sentó en la silla. Ella todavía se estaba arreglando la ropa. El le dijo que le iba a dar otros medicamentos y entró con una cajita china. Ella no le contestó, cogió los papeles, salió del cubículo y pagó. Iban a ser ya las 7:00 ó 7:10 más o menos. Se montó en el carro y empezó a llorar porque no sabía qué hacer. No sabía si seguir hacia su casa, pues estaba nerviosa y le temblaban las manos. Estaba bien asustada y avergonzada. Llegó a su casa como en 15 minutos aproximadamente.

A su llegada, le contó a su esposo lo sucedido en la oficina del Dr. Placer. Ambos se dirigieron al cuartel de la policía y presentaron una querella. De la información que se recopiló esa noche, se preparó un informe de actos

lascivos y se citó a la perjudicada y a su esposo para el próximo día 2 de junio de 1990, para que acudieran a la División de Delitos Sexuales para continuar con el trámite de la querella.

## II

Por estar íntimamente relacionados, discutiremos en conjunto los primeros dos señalamientos de error.

*"El apelante plantea, esencialmente, que la prueba del Ministerio Público no demostró más allá de duda razonable que él llevó a la perjudicada al acto mediante engaño al punto de anular o disminuir sustancialmente su capacidad para resistir el avance sexual sin que ella se diera cuenta de lo que hacía. A juicio del Dr. Placer, la prueba adoleció del elemento de engaño, pues no hubo evidencia que demostrara que la paciente fue obligada a desabrocharse su ropa, a acostarse en la camilla, ni a recibir masajes en las áreas afectadas. Añade, en la alternativa, que los hechos declarados por la perjudicada sólo configuran el delito de agresión agravada en su modalidad menos grave, pues la prueba adoleció de los elementos de engaño y disminución sustancial de la capacidad de la perjudicada. Indica que los alegados actos fueron conscientes y con conocimiento de su significado."*

No podemos validar los argumentos del apelante. Los actos libidinosos se definen como todos aquéllos que constituyen un atentado al pudor de otra persona. Dora Nevares-Muñiz, *Código Penal de Puerto Rico Revisado y Comentado*, Instituto para el Desarrollo del Derecho, Inc., Hato Rey, 1998, pág. 206.

En este caso, los elementos del delito imputado son realizar un acto impúdico o lascivo con otra persona, sin intención de tener acceso carnal, y que la víctima sea compelida al acto mediante el empleo de medios engañosos que anulen o disminuyan sustancialmente, sin su conocimiento, su capacidad de resistencia.

La prueba del Ministerio Público, creída por el juez, evidenció que el Dr. Placer, sin intentar tener acceso carnal con la señora Rodríguez Arce, cometió un acto que atentó contra el pudor de ésta al llevar su mano al área púbica de la perjudicada, introduciendo su dedo dentro del área vaginal mientras le agarraba un seno y le preguntaba si se lo podía chupar.

En este caso, existía una relación médico-paciente entre la víctima y el apelante. Dicha relación estaba fundamentada en la confianza de que se le haría el examen de rigor para llegar a un diagnóstico correcto y a un tratamiento adecuado.

En este sentido, cuando la paciente se desabrochó, tanto el pantalón como el sostén y se acostó boca arriba en la camilla, ella seguía las instrucciones del médico al que le había depositado su confianza como profesional de la salud. Fue a través de dichas instrucciones que el médico logró acceso a la vagina y al seno de la perjudicada. Ciertamente aquí hubo engaño. Engañar es inducir a otro con artificio o maldad a creer y tener por cierto o bueno lo que no es. ▮ La perjudicada fue inducida a dar por bueno el examen que se le hacía valiéndose el médico de su autoridad médica con la perjudicada. La víctima, en esos momentos, no tenía capacidad para resistir el avance sexual, pues había sido colocada en una situación engañosa de un examen físico rutinario. En otras palabras, el doctor, ejerciendo autoridad médica con su paciente, la engañó con la apariencia de que iba a continuar con el examen físico rutinario cuando le pidió que se acostara boca arriba en la camilla.

Es nuestra opinión que el Ministerio Público probó más allá de duda razonable el delito imputado con prueba satisfactoria, suficiente en derecho, según percibida directamente por la perjudicada, a quien el juzgador de los hechos otorgó total crédito. La adjudicación de credibilidad, como se sabe, es una función propia del juzgador de los hechos, que prevalece siempre, salvo que haya mediado prejuicio o error manifiesto de su parte. *López v. Bonilla Romero*, 120 D.P.R. 92 (1987).

Ciertamente, la prueba de cargo -que los actos lascivos se cometieron mientras la víctima se encontraba boca arriba en la camilla con su pantalón y sostén desabrochados por instrucciones específicas del apelante; que a pocas horas de ocurridos los hechos, la perjudicada presentó una querella ante la policía; y que las actuaciones del

apelante ocasionaron que la perjudicada quedara nerviosa, cabizbaja, abochornada, tensa y llorando-, demuestra la comisión de actos libidinosos que atentaron contra el pudor de la perjudicada. Los alegados errores no fueron cometidos.

## III

El tercer señalamiento de error gira en torno a la negativa del tribunal de instancia a acceder a una moción de nuevo juicio fundamentada en la Regla 188(f) de las de Procedimiento Criminal, la cual expresa que *"[e]l tribunal, además, concederá un nuevo juicio cuando, debido a cualquier otra causa de la cual no fuere responsable el acusado, éste no hubiere tenido un juicio justo e imparcial."*

El apelante alega que no tuvo un juicio justo e imparcial por falta de representación legal adecuada. Plantea, bajo este señalamiento de error, que la representación legal que estuvo a cargo de su defensa en el juicio incidió de manera perjudicial al no presentar cierta evidencia que, según reclama, estuvo disponible al momento del juicio. Cuestiona el hecho de que no se presentara una máquina de masajes conocido como *"Tens"*, que no se le permitiera declarar a su favor, que no se le permitiera presentar el testimonio de una perito en fisiatría y también cuestiona la voluntariedad de su renuncia a la celebración del juicio por jurado.

Sabido es que el derecho de todo acusado a una adecuada asistencia de abogado, está garantizado por la Sección 11 del Artículo II de la Constitución del Estado Libre Asociado de Puerto Rico. El derecho a tener representación legal en casos criminales, se ha consagrado como parte fundamental de la cláusula del debido proceso de ley. Se ha reconocido, además, que el derecho constitucional a asistencia de abogado debe ser uno adecuado y efectivo.

El derecho a tener una efectiva o adecuada representación legal, puede quedar menoscabado cuando:

*"(a) el abogado es incompetente para la tarea que se le asigna;*

*(b) como cuestión de hecho, la labor desplegada demuestra su inefectividad;*

*(c) hay un potencial o actual conflicto de intereses para el abogado;*

*(d) las reglas o actuaciones del tribunal constituyen una limitación irrazonable al derecho a tener adecuada asistencia de Abogado."* (Citas omitidas) *Pueblo v. Ortiz Couvertier*, 132 D.P.R. 883 (1993).

La violación a este derecho conlleva la revocación de la convicción decretada a nivel de instancia y la celebración de un nuevo proceso. Por otro lado, recae sobre el apelante que alega no haber tenido una adecuada representación legal a nivel de instancia, el peso de la prueba a esos efectos. La incompetencia profesional a nivel de instancia, la cual conlleva la revocación de la convicción, debe ser de tal grado que se pueda sostener, de manera razonable, la probabilidad de que el resultado del proceso criminal, a no ser por dicha incompetencia, con toda probabilidad hubiese sido otro. *Pueblo v. Fernández Somono*, __ D.P.R. __ (1996), **96 J.T.S. 49**; *Pueblo v. Ríos Maldonado*, 132 D.P.R. 146 (1992); *Pueblo v. Morales Suárez*, 117 D.P.R. 497 (1986). El Tribunal Supremo ha resuelto que a nivel apelativo existe una presunción a los efectos de que la representación legal, a nivel de instancia, fue una adecuada y satisfactoria. *Pueblo v. López Guzmán*, 131 D.P.R. 867 (1992).

Nuestro más alto foro, a su vez, ha emitido una serie de pronunciamientos que resumen las limitaciones del reclamo de falta de asistencia legal de un acusado. Primero, que *"[u]na debida asistencia legal, le garantiza al acusado un juicio justo e imparcial, pero no puede garantizarle que será declarado inocente si es culpable".* *Torres Martínez v. Delgado, Jefe de la Penitenciaría*, 93 D.P.R. 391 (1966). Segundo, que *"[e]l requisito constitucional de una representación legal que le provea al acusado un juicio justo, no quiere decir que todo error de juicio o de estrategia en el juicio o concepto erróneo con respecto al derecho aplicable, priva al acusado de ese derecho constitucional".* *Molina Santana v. Delgado, Jefe de la Penitenciaría*, 96 D.P.R. 191 (1968). Tercero, que *"meros errores o equivocaciones del defensor, no justifican que se deje sin efecto una sentencia, a*

*menos que se trate de una situación que haya convertido el proceso en una farsa o negación palmaria de la justicia". Pueblo v. Marrero Laffosse*, 95 D.P.R. 186, 190 (1967); *Pueblo v. Díaz Martínez*, 87 D.P.R. 691 (1963); *Pueblo v. Torres*, 81 D.P.R. 678 (1960).

El criterio a seguir en estos casos fue esbozado claramente en *Pueblo v. Morales Suárez*, 117 D.P.R. 497, 500-501 (1986):

*"La alegación de falta de defensa efectiva deberá demostrar, antes de que merezca un examen a fondo, que la conducta errónea del abogado ha resultado en perjuicio de tal naturaleza que de no haberse producido, el juzgador de hechos hubiese llegado, con razonable probabilidad, a conclusión distinta respecto a la responsabilidad del acusado. El tribunal de apelación debe albergar una fuerte presunción de que la conducta del defensor está comprendida dentro del amplio ámbito de una razonable asistencia legal, y toca al apelante derrotar la presunción de que, en las circunstancias que confrontó el abogado en el juicio, su actuación impugnada puede considerarse como estrategia correcta. Al pasar juicio sobre falta de defensa efectiva en causa criminal, no puede prescindirse de la libertad e independencia del abogado, un valor protegido en la Constitución, y restringir la amplitud de su campo al tomar decisiones tácitas. Una evaluación justa de la efectividad de la defensa que garantiza el Art. II, Sec. 11 de la Constitución del Estado Libre Asociado, debe guardar gran deferencia para el defensor, y exige un esfuerzo para eliminar el efecto distorsionante sobre el análisis retrospectivo, la reconstrucción de las circunstancias en que surgió la actuación impugnada del abogado y un examen de la conducta profesional desde la perspectiva que confrontó el defensor en aquel momento. El criterio final para adjudicar una reclamación de falta de efectividad en la defensa, debe ser si la actuación del abogado de tal modo vulneró el adecuado funcionamiento del sistema adversativo que no pueda decirse que el juicio tuvo un resultado justo."*

Expuesto lo anterior, pasemos a examinar los señalamientos del apelante.

El apelante argumenta que su renuncia a juicio por jurado no fue libre, ni voluntaria, y que se dio sólo porque su principal abogado lo llevó a creer que esa era la única forma de lograr una suspensión del caso.

En una declaración jurada, fechada el 10 de noviembre de 1999, que fuera sometida como fundamento para su solicitud de nuevo juicio, el Dr. Placer declara lo siguiente:

*"Estando el caso señalado para juicio, mi principal abogado, Lcdo. Francisco Dolz, me manifiesta que no se encuentra preparado para entrar al caso y le solicitó al Honorable Juez que transfiriera la vista del caso. Según mi abogado, la única forma de lograr una suspensión era si se renunciaba al jurado. Yo le había indicado que quería ver mi caso por jurado. El abogado también me prometió que si yo accedía a la renuncia a jurado, me permitiría declarar a mi favor, cosa que deseaba. El caso se suspendió, pero no se me permitió declarar. A pesar de que el Honorable Juez me examinó sobre mi renuncia, la misma no fue una libre, pues accedí a la misma confiando en mi abogado."*

El expediente del caso de marras contiene el documento sobre renuncia al derecho a juicio por jurado. En el referido documento, el acusado, bajo juramento, declara que tiene una preparación académica de doctor en medicina; que había recibido una explicación de su abogado de lo que constituia tanto el derecho a juicio por jurado como el juicio por tribunal de Derecho; que había renunciado al juicio por jurado en la causa criminal de epígrafe *"personalmente libre de toda o cualquier influencia extraña y que no se me ha amenazado u obligado en forma alguna, así como tampoco se me ha ofrecido o prometido nada a cambio de dicha renuncia"*; que estaba consciente del contenido del derecho a juicio por jurado y de que el juez podía restituir el derecho a juicio por jurado si éste era solicitado oportunamente.

Además, surge de la minuta del día 10 de agosto de 1999, que el tribunal examinó ampliamente al apelante con relación a su renuncia a que se celebrara su juicio ante jurado. Ciertamente, el apelante no ha puesto en condiciones a este tribunal de conocer el interrogatorio a que fue sometido con relación a su renuncia, pues no se

incluyó transcripción alguna sobre este particular en el recurso de epígrafe. La alegación de que la renuncia a juicio por jurado no fue libre y voluntaria, no está respaldada por documento o hecho alguno.

No estamos en condiciones de resolver que la referida renuncia no fue libre y voluntaria, con pleno conocimiento de causa. No hemos podido detectar irregularidad alguna en los procedimientos. No hay que olvidar que, entre las presunciones más importantes en nuestro sistema de derecho está la de regularidad en el cumplimiento de un cargo y la de que la ley ha sido acatada. Por consiguiente correspondiente a aquella parte que las cuestiones demostrar lo contrario. En el presente recurso, el apelante no ha cumplido con el estándar de prueba requerido para rebatir la presunción de regularidad de los procedimientos.

El apelante alega, además, que hubo falta de defensa efectiva al no permitirle declarar sobre el uso de la máquina "Tens" y sobre otra documentación médica con relación al tratamiento con dicho equipo.

En la vista de la moción de nuevo juicio celebrada el día 29 de diciembre de 1999, la defensa tuvo la oportunidad de testificar sobre el funcionamiento de la máquina "Tens" y el uso que alegadamente le dio el Dr. Placer al equipo cuando examinó a la perjudicada el día de los hechos. Nada de lo testificado por el Dr. Placer en dicha vista, nos convence de que hubo una conducta errónea del abogado, que de no haberse producido, el juzgador de hechos hubiese llegado, con razonable probabilidad, a una conclusión distinta respecto a la responsabilidad del acusado. Por el contrario, el testimonio del Dr. Placer en la vista de la moción de nuevo juicio respecto a la máquina "Tens" y a su uso el día de los hechos, fue cuando menos contradictorio y más que beneficioso, perjudicial a su causa. Véase Transcripción de Evidencia de la Vista de la Moción de Nuevo Juicio, Apéndice, págs. 88-95.

El apelante indica, además, que colocó a disposición de sus abogados literatura médica capaz de llevar dudas al tribunal sobre la culpabilidad del acusado, mencionando entre ella un libro de ilustraciones de síntomas, diagnósticos y tratamientos que un médico de familia puede utilizar, dirigida a demostrar la ausencia de engaño y desconocimiento. Señala como grave error de parte de sus abogados, el no presentar dicha prueba en el juicio. Por último, entiende que su representación legal falló al no presentar en el juicio el testimonio de la perito en fisiatría, Dra. María del Carmen Colón. La misma, indica el apelante:

*"declararía sobre los distintos medios de tratamiento en el diagnóstico de espasmos de tipo muscular. Pudo haber aclarado al Tribunal o al Jurado sobre la capacidad del médico de familia, como cualquier otro, de realizar exámenes físicos como parte de ese diagnóstico diferencial, sobre el ámbito de éste y las áreas que puede cubrir.*

*La primera manifestación de la alegada perjudicada sobre lo que sucede, supuestamente, es que el Doctor le toca su área púvica (sic) y de haber declarado la Perito (sic) hubiera demostrado que medicamente (sic) ese tipo de exámen (sic) esta (sic) permitido dentro de ese diagnóstico o enfermedad, por eso es que se llama diferencial. Definitivamente esta Perito también hubiera contestado la interrogante de este Honorable Tribunal sobre si un médico de la especialidad del Doctor Placer podía realizar este tipo de examen."*

La referida prueba, de ser ofrecida en el juicio, sólo hubiera intentado legitimar el contacto que tuvo el apelante con la región vaginal de la perjudicada. La prueba testifical y documental, cuya falta alega el apelante le perjudicó, no tiende a establecer la existencia de un eximente de responsabilidad penal, ni controvierte el testimonio de la perjudicada, por lo que no tenía la capacidad de alterar el resultado del juicio.

Cabe señalar, finalmente, que el reclamo del apelante en el sentido de que *"[l]a alegada perjudicada nunca habló de introducción de dedos por la vagina hasta que fue entrevistada para al (sic) toma de su declaración jurada,"* sin más, no basta para concluir que el tribunal de instancia abusó de su discreción al denegar la solicitud de nuevo juicio.

Recordemos que la concesión de un nuevo juicio descansa en la sana discreción del tribunal sentenciador y

dicha actuación no se alterará, a menos que se demuestre un claro e inequívoco abuso de discreción, situación que no ha ocurrido en el caso que nos ocupa. *Pueblo v. Morales Rivera,* 115 D.P.R. 107 (1984); *Pueblo v. Prieto Maysonet,* 103 D.P.R. 102 (1974); *Pueblo v. Rivera,* 121 D.P.R. 454 (1988); *Pueblo v. Chévere Heredia,* __ D.P.R. __ (1995), **95 J.T.S. 115**. Resolvemos que el tercer error señalado, no fue cometido.

### IV

Por lo anteriormente señalado, se confirma la sentencia de la Sala Superior de San Juan del Tribunal de Primera Instancia en el caso de epígrafe.

Así lo acordó y manda el Tribunal y lo certifica la Subsecretaria General.

Gladys E. Ortega Ramírez
Subsecretaria General

**ESCOLIO 2001 DTA 157**

**1.** *Diccionario General Ilustrado de la Lengua Española,* Vox, Barcelona, 1991.