EL PUEBLO DE PUERTO RICO, demandante y apelado, *v.* CA-
TALINO GARCÍA POMALES, acusado y apelante.

*Número:* CR-66-288      *Resuelto:* 21 de marzo de 1967

*Raúl A. Feliciano,* abogado del apelante; *J. B. Fernández Badillo, Procurador General,* y *Américo Serra, Procurador General Auxiliar,* abogados de El Pueblo.

EL JUEZ ASOCIADO SEÑOR RAMÍREZ BAGES emitió la opinión del Tribunal.

El apelante, Catalino García Pomales, fue acusado y convicto del delito de violación técnica consistente en haber

tenido relaciones sexuales con una menor, mayor de 14 años, que no era su esposa y que "estaba incapacitada mentalmente para prestar su consentimiento al acto carnal por razón de un defecto mental." Fue sentenciado a cumplir de dos a cinco años de presidio.

Apunta el apelante que el tribunal sentenciador incidió (1) al denegar la solicitud de la defensa de que se examinara preliminarmente a la perjudicada en ausencia del jurado para determinar su capacidad para ser testigo y al permitir que se sentara en la silla de los testigos ofreciendo un espectáculo perjudicial a los derechos del acusado que necesariamente influenció en el resultado del juicio; (2) al denegar las instrucciones solicitadas por la defensa; (3) al declarar convicto al acusado (a) a pesar de haber evidencia que eliminaba el indispensable elemento de intención y de demostrar que la perjudicada podía consentir válidamente; y (b) a base de los testimonios increíbles y contradictorios de dos testigos lo que tenía que haber creado duda en la mente del jurado.

Por las razones expuestas a continuación, concluimos que el tribunal de instancia no incurrió en los errores apuntados.

1.—Al llamarse a declarar a la perjudicada, solicitó la defensa que en una vista preliminar y en ausencia del jurado el tribunal determinase sobre la capacidad de la testigo antes de proceder a su interrogatorio. Determinó el juez sentenciador que "Eso se determina por el interrogatorio que se haga en el juicio del acusado." El interrogatorio de la perjudicada fue breve y dificultuoso porque la testigo no contestaba, gesticulaba con la cabeza o con las manos, hacía muecas y lloraba. El tribunal de instancia dictaminó que "El Tribunal cree que esta testigo no está capacitada para declarar como testigo."

■ Arguye el apelante que la incapacidad de la perjudicada era conocida por el juez y el fiscal debido al hecho

que en este caso se había celebrado un juicio anterior. El juez, *motu proprio*, ordenó la celebración de otro porque se había incurrido en el error de no haber instruido al jurado sobre la corroboración de la declaración de la perjudicada. Insiste el apelante que el procedimiento indicado era el de celebrar una vista preliminar sobre la capacidad de la testigo ante el tribunal sin el jurado, de acuerdo con lo resuelto en *Pueblo* v. *Arocho Medina*, 93 D.P.R. 162 (1966), y en los casos citados en éste. No fue error el que la vista en cuestión se llevase a cabo en presencia del jurado. *Collier* v. *State*, 140 N.W.2d 252, 255 (Wis. 1966); *State* v. *Butler*, 143 A.2d 530 (N.J. 1958); *People* v. *Monks*, 24 P.2d 508, 511, 512 (Ct. App. Cal. 1933).

■ Además, en este caso el fiscal podía presentar a la perjudicada ante el jurado como prueba viva de un elemento esencial del delito, es decir, de que por su demencia u otro defecto mental temporero o permanente, estaba incapacitada para consentir legalmente (33 L.P.R.A. sec. 961). Era ella en sí un elemento de prueba sobre su incapacidad mental para consentir, a ser apreciado por el jurado, junto con el testimonio del perito médico que testificó sobre la misma cuestión.

En casos de esta naturaleza, la apariencia y comportamiento de la perjudicada, su inteligencia general según se desprende de sus contestaciones a las preguntas del fiscal y de la defensa, son cuestiones importantes que merecen consideración en la determinación de si carecía de capacidad mental suficiente para consentir al acto sexual. La capacidad mental de la mujer es un hecho vital que el jurado debe considerar al determinar la culpabilidad del apelante. *State* v. *Fox*, 31 N.W.2d 451, 455 (S.D. 1948); *People* v. *Monks*, supra; *People* v. *Boggs*, 290 Pac. 618 (Ct. App. Cal. 1930).

■ Cuando se presenta el testimonio de la perjudicada a los fines indicados, el juez debe así indicárselo específica-

mente al jurado. *State* v. *Meyer*, 226 P.2d 204, 208 (Wash. 1951). En este caso (a) la perjudicada compareció personalmente a declarar ante el jurado; (b) se presentó prueba adicional de su incapacidad para consentir—el testimonio al efecto de un perito médico—; (c) la ocurrencia del acto carnal entre el apelante y la perjudicada fue ampliamente establecida a través del testimonio de testigos que lo presenciaron; y (d) el juez sentenciador instruyó al jurado al efecto de que "si por la prueba llegan ustedes al convencimiento fuera de toda duda razonable . . . que al momento de cometer dichas relaciones sexuales . . . la perjudicada era una incapacitada mental para prestar un consentimiento válido al acto carnal por razón de un defecto mental. . . ."

No creemos, por lo tanto, que la instrucción al jurado sobre el hecho de que el fiscal hacía comparecer a la perjudicada como parte de la prueba de su incapacidad mental para consentir, era tan esencial en este caso que su omisión perjudicó los derechos del apelante en forma sustancial al extremo de requerir que revoquemos la sentencia en este caso.

■ 2.—El juez de instancia denegó las instrucciones solicitadas por la defensa al efecto de que en casos como éste es imprescindible probar que el grado de incapacidad mental de la perjudicada era de tal naturaleza que ella no podía entender la naturaleza y consecuencia del acto que está realizando y que si ella sabía lo que es, en qué consiste tener relaciones sexuales con un hombre, entonces el delito imputado no se ha cometido y que del mero hecho de que tenga una mentalidad débil no por ello necesariamente se deduce que es incapaz de consentir al acto sexual.

Estas instrucciones eran innecesarias, pues el juez ya había instruido al jurado que el consentimiento de la mujer para el acto sexual está viciado de nulidad por razón de algún defecto mental de tal naturaleza que impida a la

mujer el conocer las implicaciones, la naturaleza o conocimiento del acto sexual; que para que el consentimiento de la mujer constituya una defensa legal, tiene que ser el de una persona que por su condición mental conoce las implicaciones del acto sexual, sus concomitancias, sus consecuencias, sus aspectos, etc. Más adelante, se instruyó al jurado que "ese defecto mental debe ser de tal naturaleza que impida a la mujer prestar su consentimiento legal. . . . Si el defecto mental es uno que no inhibe el conocimiento de las consecuencias, de las concomitancias, de la naturaleza del acto sexual . . . repito, el defecto mental debe ser de tal naturaleza, de tal condición que impida a la mujer que lo padece, poder justipreciar, ponderar, evaluar, las consecuencias del acto sexual."

■ No procedía, a nuestro juicio, la instrucción solicitada al efecto de que si la mujer, impulsada por una pasión sexual o animal fuerte aun cuando esté loca, idiota o imbécil, se somete al acto sexual sin resistencia, no se puede decir que fue en contra de su voluntad o sin su consentimiento. Esta instrucción está basada en una teoría anticuada, minoritaria y que no se justifica a la luz de las disposiciones claras y precisas del estatuto que define el delito imputado en este caso.

3.—Basándose en lo que resolvimos en *Pueblo* v. *Hernández*, 93 D.P.R. 435 (1966), se apunta que incidió el tribunal al declarar convicto al apelante a pesar (a) de haber evidencia que eliminaba el indispensable elemento de intención y (b) de demostrarse que la perjudicada podía consentir válidamente. Se arguye que "es un elemento indispensable del delito de violación técnica el probar la intención criminal" y que el testimonio del perito Dr. Torres Aguiar destruyó o creó duda razonable sobre dicho elemento de intención.

■ Nuestro dictamen en *Hernández*, supra, no tiene el alcance de imponerle al fiscal la obligación de probar la intención del acusado del delito de violación técnica como arguye el apelante. Por el contrario, dijimos en dicho caso que es razonable que en casos como éste el acusado tenga la oportunidad de establecer que no tenía conocimiento de que la perjudicada fuera una retardada mental—circunstancia que justificaría la ausencia de intención criminal. Pero añadimos que "No es imponerle al fiscal la obligación de establecer que el acusado conocía el hecho de la condición mental, sino que el acusado puede establecer como defensa que no tenía conocimiento de ese hecho." En este caso la defensa no ofreció prueba alguna.

■ La ausencia de tal intención no se desprende del testimonio del siquiatra. Éste. testificó que la edad mental de la perjudicada "Estaba a nivel de un infante, digamos, de cuatro a cinco años"; que estaba capacitada intelectualmente para el acto sexual, pero no lo estaba emocionalmente; que "el acto sexual es para ella un hombre y una mujer unirse, nada más, sin saber consecuencia, ni usando buen juicio, cuándo se debe hacer y quién lo debe hacer"; que definitivamente no puede consentir válidamente al acto sexual aunque tiene propensión a dicho acto debido a que el empobrecimiento de su juicio se manifiesta en el área sexual; que "sexualidad en ella es sexualidad infantil, ella usa sexo, no es verdaderamente sexual, lo que está buscando es cariño, aceptación, porque ella es una niña." No vemos cómo se pueda inferir que ese testimonio "destruyó o creó enorme duda razonable sobre el indispensable elemento de intención" como arguye la defensa, ya que el apelante no conocía el testimonio del siquiatra antes de tener contacto con la perjudicada y, además, dicho testimonio no justificaba creer que aquélla no era una retardada mental.

■ 4.—Sostiene la defensa que los testimonios de los testigos presenciales de los hechos del delito, o sea, del hermano y del padre de la perjudicada, son inherentemente increíbles, contradictorios y tienen que haber creado duda razonable. En síntesis, el apuntamiento se basa en que el testimonio del hermano es inherentemente increíble porque dijo que se le fue detrás a la perjudicada hasta el sitio donde ocurrieron los actos y que al él llegar allí encontró que el acusado usaba a la perjudicada como marido y mujer; que no es normal que un hermano que presencia lo que le ocurría a su hermana no tratase de impedirlo de palabra o por medio de alguna actuación de su parte sino que fue a buscar a su padre que estaba enfermo con fiebre, a pesar de que el lugar de los hechos era un sitio de difícil acceso aun para una persona de 30 años como el hermano de la perjudicada. Apunta que el testimonio del padre tampoco debió merecer crédito alguno porque a pesar de que las únicas palabras que se cruzaron entre padre e hijo al éste volver del lugar de los hechos fueron "ven para que veas cómo está tu hija", sin embargo, el padre no tuvo dificultad en llegar a dicho sitio situado en una finca colindante.

Testificó el hermano que su hermana no salía sola de la casa de su padre donde vivía; que el día de los hechos él se encontraba en el batey de su propia casa a media cuerda de la de su padre cuando vio pasar a la perjudicada sola. Esto le extrañó. Como a los dos minutos de cruzar ella, se le fue detrás. Ella llegó al sitio de los hechos que quedaba a unos 50 ó 60 pies de la casa del testigo entre unas malezas y árboles; que dicho sitio quedaba en un caminito que va directo a la casa de su padre; que como donde el testigo vive es una pendiente, al seguir a su hermana él bajó y quedó más abajo del sitio de los hechos; que al llegar cerca del sitio observó al apelante realizando el acto sexual con la perjudicada; que lo único que se le ocurrió fue ir a buscar

a su padre para que viera, pues si se lo decía no se lo iba a creer; que no subió al sitio porque el apelante se le podía ir y "la muchacha del mismo susto podía darse un golpe"; además, el sitio era peligroso y muy estrecho para socorrerla; que no encontró piedra para tirarle y que de haberlo hecho "casualmente podría localizarla a ella y darle un golpe porque era un sitio muy incómodo"; que no les gritó "porque la muchacha de la misma nerviosidad podía caerse y darse un golpe" y porque si les gritaba "brinco y le doy la razón a mi papá y papá no me iba a creer entonces." Testificó este hermano, por último, que regresó lo más ligero que pudo del referido sitio para avisar a su padre de manera que éste se enterara del caso. Le contó a su padre lo que había visto. Aunque podría decirse que la reacción de este testigo no es la usual para tratar de evitar el acto que presenció, el testigo explicó su reacción y no aparece ni se ha aducido razón para concluir que el jurado actuara irrazonablemente al creerla. De dicho testimonio se puede concluir que entre padre e hijo pasaron más palabras que las que señala el apelante y se puede inferir que en el curso de la información que el hijo le suministró al padre sobre lo que había visto, necesariamente debió indicarle el lugar en que ocurrían los hechos. No es increíble que el padre rápidamente llegase al lugar de los hechos pues en realidad éste quedaba cerca y aunque era de difícil acceso desde donde el hijo se pudo situar para observar los hechos del delito, el sitio en cuestión quedaba en un caminito que iba directo a la casa del padre, de manera que es de suponer que éste no tuvo dificultad en avanzar y llegar al referido lugar.

*En vista de lo expuesto, se confirmará la sentencia dictada en este caso por el Tribunal Superior, Sala de San Juan, en 21 de febrero de 1966.*