EL PUEBLO DE PUERTO RICO, apelado, *v.* ISRAEL PÉREZ RIVERA, apelante.

*Número:* CR-86-8          *Resuelto:* 28 de junio de 1991

*Carlos Ramos Pantojas*, abogado del apelante; *Norma Cotti Cruz, Subprocuradora General,* y *Rose Mary Corchado Lorent, Procuradora General Auxiliar,* abogadas de El Pueblo.

## SENTENCIA

El 18 de julio de 1985 el Ministerio Público presentó acusaciones por los delitos de violación técnica y secuestro agravado, Arts. 99 y 137A(b), respectivamente, del Código Penal, 33 L.P.R.A. secs. 4061 y 4178a(b), por actos alegadamente cometidos por el apelante sobre una incapacitada mental. Celebrado el juicio por jurado, el apelante fue hallado culpable de violación técnica y no culpable por el delito de secuestro agravado. Fue sentenciado a cumplir quince (15) años de prisión, pero bajo los beneficios de una sentencia suspendida. De esa sentencia acude ante nos imputando al foro de instancia los errores siguientes:

(1) Hay insuficiencia de prueba para sostener la convicción; de existir prueba, la misma no destruye la presunción de inocencia, por el contrario, la misma crea duda razonable.

(2) Existe inconsistencia en los veredictos; el apelante fue declarado no culpable en el caso G85–1835 por Secuestro Agravado y culpable en el caso aquí apelado, siendo los hechos de ambos casos actos relacionados entre sí e inseparables.

(3) La sentencia dictada en el caso G85–1834 es excesiva y, aunque dictada dentro de los límites que la ley establece, constituye un castigo inusitado e inhumano si se consideran los hechos y circunstancias en la comisión del delito, comisión que el apelante niega.

(4) Constituyó error de derecho la admisión del testimonio del Hon. Luis Zárate Miranda, Juez de Paz, quien actuó como juez investigador en la primera etapa del proceso criminal, toda vez que su testimonio versó sobre una supuesta admisión de hechos del aquí apelante.

Para analizar sus señalamientos en su justa perspectiva, se impone un resumen de la evidencia según surge de la exposición narrativa de la prueba desfilada en el caso.

I

Para la fecha de los hechos, el apelante contaba con diecinueve (19) años de edad y la víctima con una edad cronológica de veintiséis (26) años, pero una edad sicológica de una niña de cinco (5) a ocho (8) años. Los hechos ocurrieron el 22 de noviembre de 1984 en la Urbanización Vistas del Morro de Cataño. Ese día se celebraba una fiesta en casa de la madre de la víctima en ocasión del Día de Acción de Gracias.

Como primer testigo de cargo declaró el Sr. José Acevedo Prado, vecino y amigo de muchos años de la familia de la víctima. En síntesis, declaró que el día de los hechos llegó a la fiesta en cuestión acompañado de su hermana y sobrina a eso de las 7:30 P.M. Aproximadamente cuarenta y cinco (45) minutos más tarde vio llegar al apelante. Como a la hora y cuarenta y cinco (45) minutos de haber llegado el apelante, lo vió bailando con la perjudicada. Al terminar éstos de bailar, Acevedo Prado se le acercó al apelante y *le dijo que la perjudicada era retardada mental.* Continuó atestando que su hermana fue quien invitó al apelante para que se quedara en la fiesta. Como a las nueve (9) de la noche, el testigo se marchó de la fiesta.

A eso de las 10:00 P.M., Acevedo Prado regresó a la fiesta y se percató de que las personas que allí se encontraban estaban buscando a la perjudicada, quien había desaparecido de la casa. Continuó declarando que se unió a la búsqueda por toda la urbanización. En la búsqueda se encontraron con Jackeline Martínez Castillo, quien les manifestó que había visto a la perjudicada de la mano del apelante. Decidieron, entonces, ir a casa del apelante. Una vez allí, llamaron a éste pero nadie contestó. Luego de dar una vuelta por la urbanización, regresaron a casa del apelante y le preguntaron a la madre de éste por él. Ella llamó al apelante, quien salió de su cuarto y les dijo que él había regresado a la perjudicada a su casa. El testigo decidió ir a

la casa de la perjudicada a verificar lo que el apelante les había dicho, pero aquélla no había regresado a su casa, por lo que decidió volver a casa del apelante y así informarlo a las personas que la buscaban.

Al regresar a la casa del apelante, notó que estas personas se estaban marchando. Cuando él también decidió marcharse, oyó a la hermana de la perjudicada decir "mira la tiene allá dentro". Apéndice, pág. 62. Luego declaró haber visto a la *perjudicada llorando, agarrándose los pantalones y diciéndole a su hermana al salir de la casa del apelante: "me quitó la camisa y me besó las tetas, me quitó los calzones y los 'panties' y me acostó en la cama y se me trepó encima y duro tutú."* Apéndice, pág. 62. En esos momentos llegó la Policía y se llevó al apelante.

Como segundo testigo de cargo declaró la hermana de la perjudicada (Madeline Romero). Ésta declaró en términos similares al señor Acevedo Prado sobre la llegada del apelante a la fiesta y la búsqueda de su hermana alrededor de la urbanización. Declaró, sin embargo, que ella fue quien envió a una vecina a verificar lo que el apelante le había informado al grupo sobre el regreso de la perjudicada a la casa y que, al regresar dicha vecina e informarles que la perjudicada no estaba en su casa, su madre decidió ir al Cuartel de la Policía de Cataño a informar la desaparición.

Atestó, además, que en ese momento el grupo se dispersó, pero que ella se quedó frente a la casa del apelante porque su vehículo se averió. Entonces pudo escuchar a la madre del apelante cuando tocaba a la puerta del cuarto de éste y ver cuando éste abrió la puerta y su madre lo agredió. Luego vio salir a su hermana. La testigo le gritó a los de la casa que dejaran salir a la perjudicada. Vio, además, cuando la madre del apelante sacó a la perjudicada de la casa y aquél entró y se encerró en su cuarto.

Según la testigo, *su hermana salió llorando de la casa, la abrazó y le dijo lo que había sucedido. En el contrainterrogatorio señaló que la perjudicada tenía la ropa*

*desarreglada.* Admitió que, por lo menos, su hermano mayor (Gilberto) estaba armado de un palo y se encontraba sumamente molesto con la situación, al punto que su madre tuvo que calmarlo.

Continuó declarando que en la oficina del médico del Hospital Regional de Bayamón, a donde llevaron a la perjudicada, *ésta le dijo nuevamente que el apelante le había "quitado la ropa, el 'brassiere', calzones, 'panties', la besó, apretó, la empujó, achocó contra la pared y le metió el pipí allá en el tutú con leche".* Apéndice, pág. 64.

Declaró, además, que cuando la madre del apelante salió de la casa daba la impresión de que había estado durmiendo y que, de hecho, al salir a contestarle al grupo le preguntó qué sucedía, ya que ella estaba durmiendo porque se había tomado unas pastillas para el dolor de cabeza. Según la testigo, la madre del apelante le dijo que la perdonaran por haberle negado que la perjudicada estuviera en su casa, pues ella no lo sabía.

Como tercer testigo de cargo declaró la madre de la perjudicada. Ésta corroboró la versión de su hija Madeline sobre la llegada del apelante a la fiesta y lo declarado por José Acevedo Prado sobre el baile del apelante con la perjudicada, así como sobre la búsqueda por la urbanización, su encuentro con Jackeline Martínez y lo sucedido una vez llegaron a la casa del apelante.

Atestó que decidió ir al Cuartel de la Policía de Cataño y querellarse por la desaparición de su hija. Al regresar del Cuartel de Policía ya su hija se encontraba fuera de la casa del apelante. Vio cuando la Policía arrestó al apelante.

La testigo señaló que ella y su hija se fueron en un carro patrulla al Cuartel de Policía. *Por el camino preguntó a su hija qué había pasado, a lo que la perjudicada le contestó que el apelante "le había quitado los calzones, brassiere, zapatos, la había dejado desnuda, la había besado, apretado las tetas, la empujó contra la pared y que le había metido el pipí con leche allá",* refiriéndose a su vagina. Del

cuartel llevó a su hija al Hospital Regional de Bayamón para un examen vaginal. El Dr. Luis Ortiz Meléndez le practicó el examen.

Finalmente, declaró que enseñó a su hija el nombre de las partes de su cuerpo por recomendación médica y a temprana edad. En cuanto a las partes del cuerpo del hombre, se le enseñaron por su seguridad y por recomendación médica.

En el contrainterrogatorio, la madre de la perjudicada sostuvo que en la fiesta de su casa se estaban ingiriendo bebidas alcohólicas, pero que ella no las ingiere. Admitió, además, que su hijo mayor (Gilberto) portaba un palo y estaba sumamente molesto, pero que ella le quitó el palo para evitar problemas.

La testigo de cargo Jackeline Martínez corroboró el hecho de que como a las 9:00 P.M. vio al apelante cuando iba de la mano con la perjudicada y que luego se lo informó al grupo de personas que buscaban a la perjudicada.

El Dr. Luis Ortiz Meléndez testificó que el 22 de noviembre de 1984, en horas de la noche, llevaron a la perjudicada donde él para que le practicara un examen vaginal. Procedió a realizar dicho examen. *Declaró que la vagina de la perjudicada estaba normal, como si nada hubiese pasado, sin rastros de laceración ni semen. Sin embargo, testificó que la perjudicada tiene "un himen complaciente, o sea, que es flexible y no perfora", y que del examen practicado no se podía determinar si hubo o no acceso carnal.* Señaló que el cuerpo de la perjudicada no presentaba golpes ni marcas.

Como siguiente testigo de cargo testificó el doctor Álvarez Silva, Psiquiatra. Éste declaró que tuvo la oportunidad de evaluar a la perjudicada en dos (2) ocasiones. En la primera, para determinar si tenía algún grado de retardación mental y, en la segunda, para determinar si estaba o no capacitada para declarar en un tribunal como testigo.

*Atestó que la perjudicada es una joven de veintiséis (26) años de edad cronológica, pero que su edad mental es la de*

*una niña entre cinco (5) y ocho (8) años.* Expresó que ésta padece de retardación mental severa, lo cual le hace difícil expresarse y la descualifica como testigo por tener problemas para confrontarse con la realidad.

Sostuvo que cree en la versión que la perjudicada le contó a su madre porque, al confrontarla con esta versión, ella se la repitió a él.

En el contrainterrogatorio declaró que estuvo aproximadamente dos (2) horas con la perjudicada y que en dichas visitas a su consultorio la madre de la perjudicada siempre la acompañó. Finalmente, expresó que a la perjudicada se le podían sugerir las respuestas dependiendo de la persona que le hiciera las preguntas.

El Hon. Juez de Paz, Luis Zárate Miranda, adscrito a la Sala de Investigaciones del Centro Judicial de Bayamón, fue el séptimo testigo de cargo. Declaró que el 18 de diciembre de 1984 fueron sometidas ante su consideración, para determinación de causa probable para arresto, las denuncias por violación y secuestro agravado contra el apelante. Testificó que leyó las denuncias al apelante, quien estaba solo y sin abogado, y que luego le hizo las advertencias de ley. Luego de ello, le preguntó al apelante *por qué había hecho eso si sabía que esa muchacha era demente.* A la pregunta del testigo el apelante contestó *—bajando su cabeza— que él no sabía lo que hacía y que el día de los hechos estaba "embollao".* Cuando el testigo le preguntó al apelante qué quería decir él con "embollao", *el apelante le contestó que quería decir "metido en tragos".* Apéndice, pág. 69.

Continuó declarando que el apelante le aceptó haber cometido los hechos y que sobre esa aceptación del testigo había prestado una declaración jurada ante el Fiscal investigador. En el contrainterrogatorio aceptó que generalmente no acostumbra hacerle preguntas a los imputados que son llevados a su presencia, pero que *en este caso optó por preguntarle al apelante porque "no lo veía normal;*

*estaba sumamente nervioso, incoherente, como que no se encontraba en su cabal juicio.* Inclusive le dijo al fiscal que ordenó someter el caso [que al apelante] lo debían enviar a evaluar psiquiátricamente antes de proceder con el caso". (Énfasis suplido.) Apéndice, pág. 70.

El último testigo de cargo fue el policía estatal Abraham Maysonet, quien acompañó a la madre de la perjudicada a la casa del apelante luego de que ésta fuera a querellarse al Cuartel de la Policía de Cataño. Fue, además, el policía que arrestó al apelante. Su testimonio tendió a corroborar lo declarado por los testigos de cargo que declararon lo sucedido en la casa del apelante luego de sacar de allí a la perjudicada.

En el contrainterrogatorio declaró que al arrestar al apelante en su cuarto *lo notó medio "picado", refiriéndose a que se había dado unos cuantos tragos.*

La defensa presentó como su único testigo a la madre del apelante (Sra. Alicia Rivera Martínez). En síntesis, declaró que el día de los hechos, y con motivo de celebrarse el Día de Acción de Gracias, se reunió desde el mediodía con sus tres (3) hijos en la residencia de su madre. Señaló que vio al apelante por última vez en casa de su madre a eso de las 6:00 P.M. A eso de las 9:00 P.M. decidió retirarse a su casa. Al llegar a su casa se bañó y tomó un relajante muscular porque padece de la espalda y se puso a leer una revista. Señaló que el relajante no le causa sueño porque lleva muchos años tomándolo y está acostumbrada a él. Testificó que a eso de las 10:00 P.M. sintió el portón de su casa y vio entrar al apelante con la perjudicada. Ella se quedó acostada en el sofá de la sala y vio a su hijo y a la perjudicada sentarse en el comedor a una distancia de seis (6) a ocho (8) pies de donde ella se encontraba. Continuó leyendo su revista mientras el apelante y la perjudicada permanecían todo el tiempo en el comedor hablando entre sí. Alrededor de media hora después, sintió una multitud frente a su casa que gritaba los nombres del apelante y de

la perjudicada. Según ella, era un grupo de entre treinta (30) y cuarenta (40) personas que golpeaban con palos en las rejas de su casa.

Alega ella que se asustó sobremanera y le dijo al apelante que metiera a la muchacha en su cuarto y ella salió a hablar con esas personas. Entonces se dirigió al grupo y le dijo que la perjudicada no estaba en su casa. Mientras la multitud se dispersaba, ella *se dirigió al cuarto a sacar de allí* a la perjudicada, cuando escuchó una voz que gritó desde la calle "mira, la tenían allá adentro" y "sáquenla de allí". En ese momento sacó a la perjudicada y se disculpó con la hermana de la perjudicada por mentirle; adujo que temía por su seguridad y la de su hijo debido a la actitud hostil de las personas que fueron a buscar a la perjudicada.

Con esa prueba, el Jurado encontró al apelante culpable de violación y no culpable en el cargo por secuestro agravado. Veamos, pues, los señalamientos de error del apelante.

## I

En su primer señalamiento de error el apelante aduce que la prueba de cargo era insuficiente para sostener la convicción y destruir la presunción de inocencia que le cobija. No le asiste la razón.

Reiteradamente hemos sostenido que todo acusado de delito público tiene un derecho constitucional a que el Ministerio Público demuestre su culpabilidad más allá de duda razonable en un juicio público, justo e imparcial. Art. II, Sec. 2, Const. E.L.A., L.P.R.A., Tomo 1; *Pueblo v. Robles González*, 125 D.P.R. 750 (1990); *Pueblo v. Cabán Torres*, 117 D.P.R. 645 (1986). Esta concretización práctica de la presunción de inocencia forma parte del debido procedimiento de ley. *In re Winship*, 397 U.S. 358 (1970); *Pueblo v. Cruz Granados*, 116 D.P.R. 3, 25 (1984), opinión del Juez Asociado Señor Negrón García.

Hemos definido la duda razonable como aquella insatisfacción o intranquilidad en la conciencia del juzgador de los hechos sobre la culpabilidad del acusado luego de desfilada la totalidad de la prueba de cargo. *Pueblo v. Robles González*, supra; *Pueblo v. Toro Rosas*, 89 D.P.R. 169, 175 (1963).

En *Pueblo v. Bigio Pastrana*, 116 D.P.R. 748, 760–761 (1985), expresamos el deber del Ministerio Público para rebatir la presunción de inocencia y disipar la duda razonable:

> El precepto constitucional que garantiza al acusado la presunción de inocencia exige que toda convicción siempre esté sostenida por prueba que establezca más allá de duda razonable *todos los elementos del delito y la conexión del acusado con los mismos*. (Énfasis suplido.)

La prueba del Ministerio Público sobre todos los elementos del delito y sobre la conexión del acusado "tiene que ser, además de suficiente, satisfactoria, y producir certeza o convicción moral en una conciencia exenta de preocupación ...". *Pueblo v. Narváez Narváez*, 122 D.P.R. 80 (1988). *Cf.* Regla 10(C) de Evidencia, 32 L.P.R.A. Ap. IV; *Pueblo v. Carrasquillo Carrasquillo*, 102 D.P.R. 545, 552 (1974).

Veamos si el Ministerio Público cumplió con este deber en el caso de autos.

Al apelante se le imputó haber violado a una incapacitada mental cuya edad psicológica es la de una niña de cinco (5) a ocho (8) años. Los elementos constitutivos de la violación son: (1) tener acceso carnal, (2) con una mujer que no es su esposa, (3) sin su consentimiento o mediante un consentimiento viciado. En la modalidad imputada al apelante —Art. 99(b) del Código Penal, 33 L.P.R.A. sec. 4061(b)— no es pertinente si la mujer prestó o no el consentimiento, puesto que la ley presupone que la mujer con una enfermedad o defecto mental no tiene plena facultad

de sus capacidades mentales y, por ello, su consentimiento estaría siempre viciado. Véase D. Nevares-Muñiz, *Código Penal de Puerto Rico: revisado y comentado*, San Juan, Ed. Rev. C. Abo. P.R., 1986, pág. 179.

Lo importante es demostrar que carecía de capacidad mental suficiente para consentir al acto sexual. *Pueblo v. García Pomales*, 94 D.P.R. 224, 227 (1967). Esto quedó probado en autos con el testimonio irrefutado del psiquiatra Álvarez Silva. Más aún, del testimonio del señor Acevedo Prado, según corroborado por el de la madre de la víctima, se desprende que al apelante se le informó del estado mental de aquélla. *Cf. Pueblo v. Hernández*, 93 D.P.R. 435, 444 (1966).

La prueba de cargo estableció que la perjudicada no era la esposa del apelante, y la relación entre el acusado y el delito.

La impugnación del apelante se dirige más bien al elemento del acceso carnal. Para él este elemento "sólo sucedió en la mente enferma de la joven o sabrá Dios en cuál otra". Alegato del apelante, pág. 15. Para sostener su teoría argumenta que el médico que le practicó el examen vaginal a la perjudicada no encontró residuo alguno de semen ni rastros de violencia en su cuerpo y que el psiquiatra estableció que a la perjudicada era fácil sugerirle las contestaciones deseadas.

En primer lugar, olvida el apelante que la eyaculación o presencia de semen en la vagina de la víctima no es elemento constitutivo de la violación. Art. 100 del Código Penal, 33 L.P.R.A. sec. 4062; Nevares-Muñiz, *op. cit.*, pág. 178, y que bajo la modalidad que le fue imputada no es necesario probar que medió violencia. Véase Art. 99(b) del Código Penal, *supra*. Ese es un elemento esencial en la modalidad dispuesta en el Art. 99(c) del Código Penal, 33 L.P.R.A. sec. 4061(c), el cual se reglamenta con mayor rigor y penalidad. Art. 99(c) Código Penal, *supra; Pueblo v. Oquendo*, 83 D.P.R. 234 (1961).

En segundo lugar, el médico que realizó el examen vaginal dejó establecido que del examen practicado no se podía determinar con certeza si hubo o no acceso carnal porque la perjudicada tiene *"un himen complaciente, o sea, que es flexible y no perfora"*.([1]) Desde 1907 este Tribunal dejó establecido que la violación queda consumada con la más ligera penetración del miembro del ofensor aunque no haya eyaculado. *El Pueblo v. Cancel*, 13 D.P.R. 178 (1907); Art. 100 del Código Penal, *supra*. *Ni siquiera es esencial probar que hubo desfloración, Pueblo v. Díaz Martínez*, 87 D.P.R. 691 (1963), o ruptura del himen.

En el caso de autos, la prueba de cargo tendente a establecer el acceso carnal consistió en las declaraciones que la perjudicada hizo a su hermana, a su madre y al psiquiatra, y que oyó el señor Acevedo Prado, contemporáneas a los hechos. Estas declaraciones fueron vertidas en los testimonios de estos testigos de cargo en el juicio. Se trata de prueba de referencia.

Desde *Pueblo v. Lugo*, 70 D.P.R. 145, 148 (1949), expresamos:

> La prueba de corroboración, admitida con la oposición de la defensa, consiste de manifestaciones que, según la madre, el padre y la hermana de la perjudicada, les hiciera ésta algún tiempo después de los hechos. Tales manifestaciones, por lo general, son prueba de referencia, pero por vía de excepción, son admisibles en ciertos delitos, entre ellos, el de violación, para corroborar la declaración de la víctima. *Su admisibilidad depende de que se hayan hecho espontáneamente y en la primera oportunidad de hacerlas libre de coacción.* (Énfasis suplido.)

---

([1]) El "himen" es una membrana, muy variable en cuanto a forma y consistencia, que se encuentra a la entrada de la vagina y la cierra parcialmente. Generalmente es un pliegue semilunar con la abertura variable en dimensiones. *Tratado de Obstetricia Dexeus*, Barcelona, Salvat, 1982, Vol. I, pág. 35. La descripción que hizo el médico concuerda con la malformación del himen conocida como "himen imperforado" o membrana que ocluye totalmente el orificio vaginal y, por ende, hace difícil la penetración del pene. *Stedman's Medical Dictionary*, 24ta ed., Baltimore, Williams & Wilkins, 1982, pág. 668. La corrección de dicha condición requiere que se practique una incisión a la paciente. R. Benson, *Diagnóstico y Tratamiento Ginecoobstétricos*, 4ta ed., México, Ed. El Manual Moderno, 1986, pág. 181.

La doctrina de *Pueblo v. Lugo*, supra, sobre admisibilidad de prueba de referencia *vía la excepción de espontaneidad de la declaración, ha sido recogida en la Regla 65(B) de Evidencia*, 32 L.P.R.A. Ap. IV, como excepción a la norma general de exclusión de prueba de referencia y *bajo la rúbrica de declaración espontánea por excitación.*

Comentando esta excepción y su aplicación en casos de declaraciones de testigos incompetentes, como lo es la perjudicada del caso de autos, señala McCormick:

> ...*an excited utterance is admisible dispite the fact that the declarant was a child and would have been incompetent as a witness for that reason, or the declarant was incompetent by virtue of mental illness* .... (Énfasis suplido.) E.W. Cleary, *McCormick on Evidence*, 3ra ed., Minnesota, West Publishing Co., 1984, pág. 959.

El profesor Chiesa advierte que "[d]e ordinario la admisibilidad de declaraciones espontáneas de un testigo incompetente se produce en casos de abusos sexuales contra niños o *retardados*". E.L. Chiesa, *Práctica Procesal Puertorriqueña: Evidencia*, San Juan, Pubs. J.T.S., 1979, Vol. I, pág. 379. Véanse: *State v. Roy*, 333 N.W.2d 398 (Neb. 1983); *Haggins v. Warden Fort Pillow State Farm*, 715 F.2d 1050 (6to Cir. 1983).

En el caso de autos, la declaración hecha por la perjudicada inmediatamente después de salir de la casa del apelante era admisible, como excepción a la prueba de referencia, por ser una declaración espontánea por excitación. Esa declaración, la cual no fue refutada, establece de forma específica el elemento del acceso carnal y la relación del acusado con el delito.

De igual modo, era admisible la declaración de la madre de lo que le dijo la perjudicada, sobre cómo sucedieron los hechos, en respuesta a su pregunta. *Cf. Pueblo v. García Reyes*, 113 D.P.R. 843 (1983).

*Las observaciones de ambos testigos, en el sentido de que*

*la perjudicada estaba llorando y con la ropa desarreglada, corroboran la declaración de ésta.*

La violación es un evento lo suficientemente alarmante para la mujer como para producir en ella una manifestación espontánea e irreflexiva; mucho más cuando se trata de una retardada mental. Desde que ocurren los hechos hasta que la perjudicada sale de la casa del apelante y se encuentra con su hermana y con su madre, *no hubo ni tiempo ni contacto con otra persona que no fuera el acusado que le permitiera a la perjudicada inventar la manifestación. Claramente la manifestación se refería, de manera específica y concisa, al hecho de la penetración.*

Difícilmente a una retardada mental con edad psicológica de cinco (5) a ocho (8) años se le ocurriría inventar, en tan corto tiempo, una versión tan específica y reveladora como la expresada en autos.

Estas declaraciones son suficientes y satisfactorias para establecer el elemento del acceso carnal, necesario para configurar el delito de violación. No era necesaria una prueba científica o de otra índole para corroborar tales declaraciones. *Com. de la Mujer v. Srio. de Justicia*, 109 D.P.R. 715 (1980).

No tenemos duda de que la prueba del Ministerio Público produce la certeza o convicción moral, en una conciencia exenta de preocupación, de que quedaron probados más allá de duda razonable todos los elementos de la violación técnica imputada en el caso de autos. Creemos que esa fue la apreciación del Jurado y no se nos han justificado las circunstancias para intervenir con dicha apreciación. *Pueblo v. Lebrón González*, 113 D.P.R. 81 (1982).

## II

El segundo señalamiento de error del apelante está fundamentado en lo que él llama veredictos inconsistentes del Jurado. El planteamiento nos parece carente de méritos.

Aparte de que nuestro ordenamiento procesal criminal le reconoce validez a los veredictos inconsistentes —*Pueblo v. Echevarría Rodríguez I*, 128 D.P.R. 299 (1991); *Pueblo v. Cortés Calero*, 99 D.P.R. 679 (1971)— no encontramos en los veredictos rendidos en autos ninguna inconsistencia. La violación y el secuestro agravado tienen elementos constitutivos distintos y son delitos separables aun cuando estén relacionados en un curso de conducta delictiva. El hecho de que el Jurado creyera que la perjudicada acompañó voluntariamente al acusado a su casa no implica que, una vez allí, tenía que creer que no se cometió la violación.

### III

Examinaremos ahora el cuarto señalamiento de error del apelante para, finalmente, considerar el último.

Se queja el apelante de la admisión en evidencia del testimonio del juez instructor que determinó causa probable para el arresto, y de la supuesta admisión de los hechos que se introdujo con ese testimonio. Sostiene que dicho testimonio era inadmisible pues no hubo tal admisión, y si la hubiera habido, el joven estaba sin representación legal y asustado cuando la hizo.

Ya hemos relatado en qué consistió el testimonio del juez instructor.

La declaración del juez instructor no debió admitirse en evidencia ni pasar al Jurado en el caso de autos. Sin embargo, a pesar de haberse cometido el error estamos convencidos, más allá de duda razonable —*Chapman v. California*, 386 U.S. 18 (1967)— de que aun si no se hubiera cometido, el resultado habría sido el mismo. *Cf.* Regla 5 de Evidencia, 32 L.P.R.A. Ap. IV; Chiesa, *op. cit.*, págs. 9 y 10.

En autos existe prueba suficiente y satisfactoria sobre todos los elementos del delito de violación técnica imputados al apelante —Art. 99 (b) del Código Penal, *supra*— y

sobre la conexión de éste con la comisión de dicho delito. Su admisión era prueba directa pero acumulativa.

El error cometido al admitir la declaración del juez instructor y sus comentarios en contra del apelante no fue perjudicial (*plain error*), ya que con la prueba desfilada antes de ese testimonio no tenemos duda que el Jurado habría llegado al mismo resultado. *Yates v. Evatt*, 500 U.S. 391 (1991).

## IV

Como último señalamiento de error, el apelante cuestiona la severidad de la pena impuesta. Sostiene que abusó de su discreción el foro de instancia al imponerle la pena de quince (15) años por la violación en el caso de autos. Según él, dicha pena constituye un castigo cruel e inusitado. No tiene razón.

El Art. 99 del Código Penal, *supra*, dispone una pena fija de quince (15) años para la modalidad de la violación por la cual fue encontrado culpable el apelante. Esa pena puede reducirse a diez (10) años, de existir atenuantes, y aumentar hasta veinticinco (25) de existir agravantes.

La pena impuesta al apelante estaba dentro de los límites dispuestos en ley. El apelante no nos ha acreditado, ni lo hizo en el foro de instancia, la existencia de atenuantes que hacen de la pena impuesta una excesiva e impuesta en abuso de la discreción del foro de instancia.

Por el contrario, notamos que el foro de instancia concedió al apelante los beneficios *de una sentencia suspendida*, en virtud de la Ley Núm. 259 de 3 de abril de 1946, según enmendada, 34 L.P.R.A. sec. 1026 *et seq.*, para cumplir la pena.

Originalmente la Ley Núm. 259, *supra*, disponía que la sentencia suspendida debía ser concedida en todo caso de delito grave que no fuere asesinato en primer grado, 34

L.P.R.A. sec. 1042, siempre y cuando concurrieren ciertos requisitos, 34 L.P.R.A. sec. 1027.

Mediante la Ley Núm. 177 de 4 de mayo de 1949 se enmendó la Ley Núm. 259, *supra, para excluir de los beneficios de sentencia suspendida las sentencias condenatorias dictadas en casos de violación, entre otras.* 34 L.P.R.A. sec. 1027.

Sostiene el Procurador General que la suspensión de la sentencia en el caso de autos *es ilegal,* por cuanto el delito de violación está expresamente excluido de los beneficios de la Ley Núm. 259, *supra.* Nos solicita su corrección.

Como regla general, una sentencia válida no se puede modificar. *Pueblo v. Tribunal Superior,* 91 D.P.R. 539, 541 (1964).

Como excepción a esta regla, se reconoce que los tribunales pueden modificar aquella *sentencia ilegal o nula por haberse impuesto en contravención a la ley.* En *Estremera v. Jones,* 74 D.P.R. 202, 206–207 (1952), dejamos establecida con meridiana claridad estas normas.

Para remediar legalmente una sentencia penal contraria a la ley se aprobó la Regla 185 de Procedimiento Criminal, 34 L.P.R.A. Ap. II, que en su inciso (a) faculta a un tribunal a "corregir una sentencia ilegal *en cualquier momento*". (Énfasis suplido.) Como expresamos en *González de Jesús v. Jefe Penitenciaría,* 90 D.P.R. 31, 33 (1964): "Así tiene que ser pues una sentencia errónea es una sentencia ilegal y los jueces, al igual que los demás ciudadanos, no pueden actuar contra la ley." Véanse, además: *Pueblo v. Lozano Díaz,* 88 D.P.R. 834, 838 (1963); *Pueblo v. Casanova Cruz,* 117 D.P.R. 784 (1986); Regla 35 de Procedimiento Criminal federal, 18 U.S.C.

Nuestra Regla 185 de Procedimiento Criminal, *supra,* permite al Ministerio Público solicitar, *en cualquier momento,* la corrección de una sentencia nula por haber sido impuesta ilegalmente. *Pueblo v. Tribunal Superior,* 94 D.P.R. 220, 222 (1967). Tal corrección la puede promover

incluso el tribunal *sua sponte. Estremera v. Jones*, supra. Aún a nivel apelativo puede corregirse ese error.

En el caso de autos se le concedieron al convicto los beneficios de una sentencia suspendida. La concesión de la misma es un derecho limitado del convicto, que se concede en aquellos casos en que el legislador ha expresado que existe una justificación para evitar su encarcelación. *Pueblo v. Rivera*, 79 D.P.R. 880, 881 (1957); *Pueblo v. Álvarez Maurás*, 100 D.P.R. 620, 624 (1972). Por disposición expresa de la Ley Núm. 259, *supra*, las convicciones por violación quedaron excluidas de los beneficios de dicha ley, por lo que el convicto de dicho delito nunca sería acreedor a tal derecho limitado.

Por lo tanto, la sentencia impuesta por el foro de instancia en el caso de autos, en cuanto a la forma de cumplir la pena, *es nula* y debe ser corregida.

Devolvemos el caso al foro de instancia para que ordene el encarcelamiento inmediato del apelante luego de descontarle a su sentencia el tiempo cumplido hasta que se emita dicha orden y se le acrediten los abonos correspondientes.

Por los fundamentos expuestos, *se dicta sentencia confirmatoria de la convicción del apelante y se devuelve el caso al foro de instancia para que proceda a corregir su sentencia, en cuanto a la forma de cumplir la pena, ordenando el encarcelamiento inmediato del apelante luego de abonarle el tiempo cumplido en sentencia suspendida y acreditarle cualesquiera otros abonos que procedan.*

Así lo pronunció y manda el Tribunal y certifica el señor Sub-Secretario. El Juez Presidente Señor Pons Núñez disiente sin opinión escrita. El Juez Asociado Señor Rebollo López disiente con opinión escrita, a la cual se une el Juez Asociado Señor Andréu García.

(*Fdo.*) Heriberto Pérez Ruiz
*Sub-Secretario*

## – O –

Opinión disidente emitida por el Juez Asociado Señor Rebollo López, a la cual se une el Juez Asociado Señor Andréu García.

Hace escasamente unos quince meses —al evaluar la corrección jurídica de una resolución emitida por la Sala de Caguas del Tribunal Superior de Puerto Rico, denegatoria de una solicitud de disolución del Jurado (*mistrial*), fundada la misma en que el Ministerio Fiscal impropiamente había llevado a conocimiento del Jurado el hecho de que el imputado había estado en disposición de aceptar su responsabilidad y declararse culpable de los hechos que el Estado le imputaba— este Tribunal, en lo pertinente, expresó en *Pueblo v. Robles González*, 125 D.P.R. 750, 758–759 (1990), que:

> Si algo demuestra la práctica de la profesión en el campo penal es que, de ordinario, *la prueba más incriminatoria, perjudicial y devastadora con que puede contar el Ministerio Fiscal contra un imputado de delito lo es la de que éste admitió la comisión del delito que se le imputa o que estuvo en algún momento en disposición de declararse culpable del mismo.* Ello así por razón de que, no importa cuán sólida y convincente pueda parecer, o ser, la prueb[a] que presenta el Estado durante el juicio, el "juzgador de los hechos" —ya sea el juez o el Jurado— nunca está totalmente convencido de la culpabilidad del acusado; ese juzgador *responsable* siempre siente una intranquilidad respecto a ello. *Ahí precisamente radica lo incriminatorio y perjudicial que resulta ser la prueba de una alegada admisión o confesión por parte del acusado en la consciencia del juzgador. Apercibido ese juzgador de que el acusado admitió lo hechos, o de que estuvo en disposición de declararse culpable, la duda o intranquilidad que le aquejaba desaparece como por arte de magia.* Esto es, la preocupación que tenía de que mediante su decreto de culpabilidad podía enviar a un inocente a la cárcel, deja de existir. (Énfasis suplido y en el original.)

El Tribunal, en el referido caso de *Pueblo v. Robles González*, al entender que el perjuicio causado por dichas ma-

nifestaciones *no* era subsanable *ni aun por las instruccio-nes* que el referido foro de instancia le había impartido al Jurado respecto a las mismas, *revocó* la resolución allí recurrida *y ordenó la celebración de un nuevo juicio* en el mismo.

I

Conforme se desprende de la exposición narrativa de la prueba —certificada como correcta por el tribunal de instancia— durante el proceso que se le celebrara al apelante declaró como testigo de cargo el Juez Luis Zárate Miranda, magistrado que determinó causa probable para arresto por los delitos por los cuales fue juzgado, y resultó convicto, el apelante.

Surge de dicha exposición narrativa que el Juez Zárate Miranda testificó, en lo pertinente, que:

> ... leyó las denuncias al apelante *quien estaba solo y sin abogado y luego le dijo las advertencias de ley.* Que luego de haberle hecho las advertencias de ley *le preguntó al apelante que porqué había hecho eso,* que si él sabía que esa muchacha era demente. *Declaró que el apelante bajó la cabeza y le dijo que él no sabía lo que hacía,* que ese día de los hechos estaba "embollao", que le preguntó al apelante que qué quería decir él con "embollao" y el apelante le contestó que quería decir metido en tragos. ... *que el apelante le aceptó haber cometido los hechos; que sobre esa aceptación el fiscal investigador del caso le tomó una declaración jurada en Fiscalía.* ... que él no acostumbra hacerle preguntas a los imputados que son llevados ante su presencia y menos si no tienen abogado; que en este caso en específico, luego de hacerle las advertencias de ley, *optó por preguntarle al apelante por las circunstancias del caso porque no lo veía normal; estaba sumamente nervioso, incoherente, como que no se encontraba en su cabal juicio.* Inclusive le dijo al fiscal que ordenó someter el caso en contra del apelante que a este muchacho lo deben enviar a evaluar psiquiátricamente antes de proceder con el caso. Declaró que esas fueron las únicas

intenciones de él al hacerle las preguntas al apelante. (Énfasis suplido.) Apéndice, págs. 69–70.(¹)

Una ligera lectura de lo anteriormente transcrito es todo lo que se necesita para concluir que la "admisión" que hiciera el apelante ante el Juez Zárate Miranda *no* era admisible en evidencia por cuanto, entre otras razones, el Estado *no* cumplió en el presente caso con su *obligación* de demostrar que la renuncia que hiciera el apelante de su derecho constitucional contra la autoincriminación fue una hecha en forma voluntaria, consciente e inteligente.

Como es sabido, *no* basta con que el Estado meramente presente prueba de que "se le hicieron las advertencias" al sospechoso o acusado. Se requiere que presente *prueba detallada* sobre las *advertencias específicas* que se le hicieron a éste. De esta manera es que únicamente se puede determinar si dicha renuncia fue una hecha en forma voluntaria, consciente e inteligente. *Pueblo v. Pellot Pérez*, 121 D.P.R. 791 (1988); *Pueblo en interés menor J.A.B.C.*, 123 D.P.R. 551 (1989).(²)

## II

Una mayoría del Tribunal, *no obstante admitir que cometió error el foro de instancia al permitir el testimonio del juez instructor*, determina en el presente caso que dicho error es uno "no perjudicial". A esos efectos —*mediante el vehículo procesal de la Sentencia*— expresa la Mayoría:

La declaración del juez instructor no debió admitirse en evidencia ni pasar al jurado en el caso de autos. Sin embargo, a pesar de haberse cometido el error estamos convencidos, más

---

(¹) Véanse: Págs. 10 y 11 de la Exposición Narrativa de la Prueba.

(²) Por otro lado, y dadas las condiciones "físicas y emocionales" en que, conforme el propio Juez Zárate Miranda, se encontraba el apelante, resulta *igualmente obvio* que cualquier manifestación que éste realizara en ese momento *no* es admisible en evidencia.

allá de duda razonable —*Chapman v. California*, 386 U.S. 18 (1967)— de que aun si no se hubiera cometido, el resultado habría sido el mismo. *Cf.* Regla 5 de Evidencia, 32 L.P.R.A. Ap. IV; Chiesa, *op. cit.*, págs. 9 y 10.

En autos existe prueba suficiente y satisfactoria sobre todos los elementos del delito de violación técnica imputados al apelante —Art. 99(b) del Código Penal[, 33 L.P.R.A. sec. 4061]— y sobre la conexión de éste con la comisión de dicho delito. Su admisión era prueba directa pero acumulativa.

El error cometido al admitir la declaración del juez instructor y sus comentarios en contra del apelante no fue perjudicial (*plain error*), ya que con la prueba desfilada antes de ese testimonio no tenemos duda que el Jurado habría llegado al mismo resultado. Sentencia, págs. 320–321.

Aparte del hecho de que *no* es correcto que la prueba de cargo es una de tal naturaleza que resista el perjuicio causado —*la misma, sobre el hecho propiamente de la violación, es una claramente circunstancial*— la "razón de decidir" del presente caso es totalmente contradictoria con la norma jurisprudencial implantada en *Pueblo v. Robles González*, ante; con el agravante de que la *situación* hoy planteada es una *aún más perjudicial* que la que presentaba el antes citado caso de *Pueblo v. Robles González*. Ello así por cuanto se trata ·de un caso en que la admisión es traída a conocimiento del Jurado *de labios de un miembro de la Judicatura*, funcionario que, a diferencia del representante del Ministerio Fiscal, *no es parte en el proceso, por lo que el efecto de su testimonio* —su credibilidad— *sobre el Jurado es uno aún mayor.* Por otro lado, debe mantenerse presente que en el caso que ocupa nuestra atención —a diferencia del caso de *Pueblo v. Robles González*, ante— *no* hubo instrucción alguna del juez al Jurado sobre el hecho de que no debían considerar dicha prueba.

## III

Este Tribunal tiene una responsabilidad *de ser consistente en sus decisiones.* Ello requiere un *auto examen* de la

"conciencia judicial" por parte de cada uno de los integrantes de este Tribunal *con el propósito de definir posiciones respecto a los distintos asuntos que llegan ante la consideración de esta Institución*. Las *actuaciones contradictorias*, como las que ilustra la sentencia emitida en el día de hoy, *no sólo afectan nuestra imagen ante la profesión legal, sino que tienen el efecto de causar gran incertidumbre y desasosiego a nivel de instancia*.

— O —

## SENTENCIA ENMENDADA
### (En Reconsideración)

San Juan, Puerto Rico, 28 de enero de 1992

Mediante Sentencia de 28 de junio de 1991 confirmamos la convicción del apelante.[1] También devolvimos el caso al foro de instancia para que corrigiera su sentencia por cuanto entendimos que, tratándose de una convicción por el delito de violación, la Ley Núm. 259 de 3 de abril de 1946, según enmendada, 34 L.P.R.A. secs. 1026–1029, no permitía que se le concediera al apelante los beneficios de la sentencia suspendida. Así, declaramos que la sentencia, en cuanto a la forma de cumplir la pena, era nula y ordenamos el encarcelamiento inmediato del apelante luego de abonarle el tiempo cumplido mediante sentencia suspendida y acreditarle cualesquiera otros abonos que procedieran.

No conforme con dicha sentencia, el 18 de julio de 1991 el apelante presentó una moción de reconsideración. En síntesis, el apelante argumentó que la sentencia dictada por el tribunal de instancia no

---

[1] El Juez Presidente Señor Pons Núñez disintió sin opinión escrita. El Juez Asociado señor Rebollo López emitió opinión disidente, a la cual se unió el Juez Asociado Señor Andréu García.

fue nula, por cuanto la Ley Núm. 103 de 29 de junio de 1955 (34 L.P.R.A. secs. 1042–1043) permite la suspensión de la sentencia en casos de delitos graves, excepto asesinato en primer grado, *cuando el convicto fuere menor de veintiún (21) años a la fecha de la comisión del delito.*

Mediante Resolución de 9 de agosto de 1991, le concedimos al Procurador General un término de sesenta (60) días para que se expresara sobre dicha moción de reconsideración. El Procurador General ha comparecido. Resolvemos.

## I

La Ley Núm. 103, según enmendada, *supra*, dispone en lo pertinente:

> Se autoriza a los jueces del Tribunal Superior de Puerto Rico para que en ejercicio de su discreción concedan sentencias suspendidas en todo caso por delito grave, excepto asesinato en primer grado ... *si el convicto fuere menor de 21 años de edad a la fecha de la comisión del delito.* (Énfasis suplido.) 34 L.P.R.A. sec. 1042.

Así, si el imputado de delito que no sea asesinato en primer grado cuenta con menos de veintiún (21) años al momento de los hechos, tiene derecho a que el tribunal, en su sana discreción, lo considere para disfrutar los beneficios de la sentencia suspendida. El fundamento para dicha disposición es que se reconoce "que todo delincuente menor de 21 años de edad, a la fecha de la comisión del delito, cuando delinque por primera vez, tiene gran posibilidad de reformarse y convertirse en un ciudadano útil a la comunidad". Exposición de Motivos de la Ley Núm. 103, *supra*, 1955 Leyes de Puerto Rico, pág. 549.

## II

No cabe duda que el joven convicto era menor de edad al momento de los hechos.[2] Tampoco existe controversia en cuanto a que el tribunal de instancia, en el ejercicio de su discreción, le concedió los beneficios de la sentencia suspendida tras la convicción por un delito que no era asesinato en primer grado.

No está claro, sin embargo, si el tribunal de instancia tuvo la intención de imponer la sentencia suspendida bajo la Ley Núm. 259, *supra*,[3] o bajo la ya mencionada Ley Núm. 103, que aplica a menores de veintiún (21) años. Sin embargo, a pesar de que la propia sentencia ordena su suspensión "a tenor con lo dispuesto en la Ley Núm. 259", no albergamos dudas de que el tribunal a quo lo hizo bajo las disposiciones de la referida Ley Núm. 103. La duda se disipa al examinar la minuta del Acto de Pronunciamiento de Sentencia, donde se señala que "[h]abiendo el tribunal examinado y corroborado que este acusado tiene 20 años se le conceden los beneficios de una sentencia suspendida".[4]

## III

La sentencia impuesta por el foro de instancia, en cuanto a la forma de cumplir la pena mediante los beneficios de la sentencia suspendida, es válida.

Por todo lo cual, se reconsidera nuestra sentencia de 28

---

[2] Los hechos ocurrieron el 22 de noviembre de 1984. El certificado de nacimiento de Israel Pérez Rivera que obra en autos revela que el convicto nació el 16 de diciembre de 1964 por lo que, para la fecha de los hechos, Pérez Rivera contaba con diecinueve (19) años y once (11) meses de edad.

[3] La Ley Núm. 259 de 3 de abril de 1946, según enmendada, 34 L.P.R.A. secs. 1026–1029, autoriza, entre otras cosas, al Tribunal Superior a conceder sentencias suspendidas en todo caso de delito grave que no sea asesinato, robo, incesto, extorsión, *violación*, crimen contra *natura*, actos lascivos o impúdicos, etc., y dispone ciertas condiciones para ello.

[4] La minuta está acompañada del certificado de nacimiento de Pérez Rivera y de su certificado de bautismo.

de junio de 1991 en cuanto anulaba la suspensión de los efectos de la sentencia apelada decretada por el tribunal de instancia y se confirma dicha sentencia en todas sus partes conforme lo dispuso el tribunal de instancia.

Así lo pronunció y manda el Tribunal, y certifica el señor Secretario General. El Juez Presidente Señor Pons Núñez y el Juez Asociado Señor Hernández Denton no intervinieron.

(*Fdo.*) Francisco R. Agrait Lladó
*Secretario General*